Union Car Advertising Co., Inc., Respondent, *v.* Barron G. Collier et al., Appellants.

(Argued December 14, 1933; decided February 27, 1934.)

*Martin Conboy, Caruthers Ewing, Basil O'Connor, William F. Snyder* and *William J. Butler* for appellants. There is no evidence to support the finding that except for the alleged acts of defendants plaintiff would have obtained a contract from the trustees. (*Lewis* v. *Bloede,* 202 Fed. Rep. 7.) Plaintiff's theory of action as presented to the jury is not recognized in law. (*Temperton* v. *Russell,* 1 Q. B. D. 715; *Keeble* v. *Hickeringill,* 11 East, 574; *Lumley* v. *Gye,* 2 El. & Bl. 216; *Allen* v. *Flood,* [1898] A. C. 1; *American Law Book Co.* v. *Thompson Co.,* 41 Misc. Rep. 396; *Morgan* v. *Andrews,* 107 Mich. 33; *Debnam* v. *Sinnonson,* 124 Md. 354; *Krigbaum* v. *Sbarbaro,* 23 Cal. App. 427; *Skene* v. *Carayanis,* 103 Conn. 708; *Ringler* v. *Ruby,* 117 Ore. 455; *Lewis* v. *Bloede,* 202 Fed. Rep. 7; *Wellington* v. *Small,* 3 Cush. 145.) There is no evidence to establish that the trustees were sufficiently satisfied with plaintiff's financial condition and responsibility to enter into any arrangement with it whatever. (*Lewis* v. *Bloede,* 202 Fed. Rep. 7.)

*Joseph M. Proskauer, Walter D. Yankauer, J. Alvin Van Bergh, Claude B. Cross* and *Edward O. Proctor* for respondent. The jury was justified in finding from the evidence that the defendants' wrongful interference prevented the plaintiff from obtaining the contract for which it was negotiating. (*Taylor* v. *Guest*, 58 N. Y. 262; *Ochs* v. *Woods*, 221 N. Y. 335; *American Specialty Co.* v. *Collis Co.*, 235 Fed. Rep. 929; *McMullan* v. *Hoffman*, 174 U. S. 639; *Standard Fashion Co.* v. *Sicgel-Cooper Co.*, 30 App. Div. 564; 157 N. Y. 60; *American Law Book Co.* v. *Thompson Co.*, 84 N. Y. Supp. 225; *Citizens L., H. & P. Co.* v. *Montgomery L., W. & P. Co.*, 171 Fed. Rep. 553; *Ashley* v. *Dixon*, 48 N. Y. 430; *DeJong* v. *Behrman Co.*, 148 App. Div. 37; *Adams* v. *Gillig*, 199 N. Y. 314; *Deyo* v. *Hudson*, 225 N. Y. 602; *Pease & Elliman* v. *Wegeman*, 223 App. Div. 682; *Hobaica* v. *Byrne*, 216 App. Div. 307.)

CRANE, J. We have examined this record with a great deal of care to see, if possible, wherein the defendants did the plaintiff injury for which the law gives redress. The eminence and ability of counsel, the size of the verdict and the desire to afford equal opportunity to business competitors have caused us to look for that angle from which we could catch a view of that unfair practice claimed by the plaintiff. We have looked in vain.

The subject-matter of this litigation is the contract or lease for the advertising space in the cars and upon the platforms of the Boston Elevated Railway. Henry Wineburgh and Barron Collier were competitors for the contract which was awarded to Collier. Wineburgh has brought this action to recover damages from Collier and his associates for the unlawful and malicious interference which prevented the award of the contract to him.

By a special act of the Legislature of Massachusetts (Acts of 1918, ch. 159), entitled, " An Act to provide for the Public Operation of the Boston Elevated Railway Company," five trustees were appointed by the Governor

of the State to manage, control and operate the road. At the time in question (1925) these trustees were Powers, Coffin, Miller, O'Hare and Marshall. Powers, a lawyer, between seventy-five and eighty years of age, had succeeded as chairman a man named Jackson. Coffin was a banker, Miller an attorney who had been Secretary to Governor McCall, O'Hare was chief executive of the labor union, and Marshall was a lawyer.

Henry Wineburgh did business in the name of the Car Advertising Company and the Union Car Advertising Co., Inc. Collier and his associates Elliott and Burnett were awarded the contract under the name of the Eastern Advertising Co., Inc. We shall use the individual and corporate names interchangeably as did the witnesses upon the trial. Wineburgh had had contracts for street car advertising in Washington, Providence, Rhode Island, Baltimore, Ohio, Toronto, Canada and other places, but in 1925 had only one left, and that was a contract with the Pennsylvania railroad for suburban cars around Philadelphia and Pittsburg. Collier had had for the previous ten years the contract for car advertising in the Boston Elevated Railway Company's cars, which was expiring April 1, 1926. His services had proved satisfactory to the company.

A new contract was about to be awarded and some time in 1924 Wineburgh had gone to Boston to see the chairman of the board to ascertain whether he could bid for the privilege. These contracts gave the full control of the advertising space in all the cars and upon the platforms, together with certain slot machine privileges, to the lessee or grantee, which spaces and privileges were thereafter rented or sublet to customers of the lessee at considerable profit. We may say that this contract or lease in question was of great value from a business standpoint. Jackson assured Wineburgh that he would be given an opportunity to bid for the new contract and that it would be awarded to the highest bidder. As to the

latter statement, Jackson had no authority to make it and was not on the board at the time of the negotiations. Later notices and circulars were sent out calling for sealed proposals for advertising, vending and weighing machine privileges to be submitted by noon of Tuesday, September 15, 1925. All of these contained the clause: " The right is reserved to reject any and all bids."

The proposed draft agreement, inclosed or referred to in these notices, and of which the plaintiff had one, and the bid contract which Wineburgh subsequently submitted, provided that the advertising company agrees to furnish to the railway company a bond in the sum of $100,000 or the railway company may increase the deposit or the security, not exceeding the amount of the first annual payment to be made, which in this case was $402,000. The contract was to be for fifteen years, for which the plaintiff, at the time designated, submitted a bid of $7,080,000, the total for the full period. Collier submitted a bid for the Eastern Advertising Company of $5,400,000, so that the plaintiff's bid was the higher by an excess of $1,680,000.

Wineburgh says that Dana, the general manager, told him before he submitted this bid that the contract would be awarded to the highest bidder and that the clause requiring the deposit or increase of security would not apply to him as they knew of his financial standing. We cannot imagine a man of Mr. Wineburgh's experience in the advertising business relying upon the representations of a general manager contrary to the express terms of the contract he was about to sign. He must have known that Dana had no power or authority to vary the written contract.

The plaintiff's claim from the very beginning seems to have been based upon the assumption or the impression that the Boston Elevated Railway trustees had bound themselves by reason of these statements of Jackson and Dana to award the contract to the highest bidder if he

furnished sufficient security. While this position from a legal standpoint has been abandoned it yet forms the framework for the picture which has been given of unfair competition. At the very threshold of this case we must bear in mind that the Boston Elevated Railway was not obliged by law to award this contract or its advertising space to the highest bidder. It could do as it pleased and show all the favoritism of which it was capable. We have instances here in this State, in the charter of the city of New York and in the laws governing the State departments, requiring contracts to be awarded to the lowest bidder when work is to be done or supplies purchased. These laws have reference to public work. We know of no law in Massachusetts that requires the elevated railway to award any contract or make any lease to the most favorable bidder. In fact no such claim is made by the plaintiff in this case, although previous litigation which it had with the railway company would seem to indicate that Wineburgh was under some such impression. The fact is beyond dispute that while bids were called for, the bidders were notified that it was optional with the trustees to reject any or all bids. Wineburgh submitted his proposition in accordance with this law, if not with his understanding.

Prior to the opening of the bids on October 1st, H. Ware Barnum, the general counsel for the trustees, had advised them that it was very doubtful whether they had the right to award a contract for fifteen years, a period beyond their own term of office. It was then decided before any bids were opened to reduce the term to five years. The bidders were present when Mr. Powers, the chairman, made the announcement in the presence of the trustees and others that the bids would be returned unopened unless by a vote of the bidders they desired to have him do otherwise. Wineburgh remembers that at this meeting the chairman announced that all bids, even if they were opened, were subject to rejection at

the will and in the discretion of the trustees. The vote being favorable, the bids were opened, showing the figures as above stated. There were other bids besides the two mentioned, but they are immaterial for the points we are discussing.

The contract was not awarded to the highest bidder and the proposition was considerably changed before it was awarded. Collier's company, as heretofore stated, received the contract the latter part of December. It is dated December 9, 1925, for a term of five years, and at a sum $101,000 higher than the plaintiff's bid for the same period. The privileges, however, had been increased so as to give the use of certain vending devices or slot machines upon the seat stanchions or posts in the cars. This made the contract more valuable. Wineburgh says that he knew nothing about this additional privilege and was not given notice thereof. His letters throw some doubt upon his ignorance, but we shall assume in our statement of the case everything most favorable to his side.

We now come to the claim which the plaintiff has made, that this contract would have been awarded to it but for the unlawful and malicious actions of Collier and his associates Elliott and Burnett. The evidence, we are convinced, shows just the contrary. The trustees, or the majority of them, were dissatisfied with the plaintiff's bid and were doubtful of Wineburgh's ability to live up to his contract, and the following statement of facts seems to justify our conclusion. His bid had been submitted in the name of this plaintiff, the Union Car Advertising Co., Inc. It had a capital of $5,000 and no assets. In fact Wineburgh said that the company owed him $30,000 or $40,000. As soon as the plaintiff's bid had been opened and received a Mr. Pingree was sent to New York to investigate Wineburgh and his company. They found that he had few dealings with the banks and expressed

their unwillingness to do business with the corporation in its then condition.

Under date of October 14, 1925, the Union Car Advertising Co., Inc., through Wineburgh, notified Mr. Pingree that the contract, if taken, would have to be in the name of the other corporation, the Car Advertising Company, which would be capitalized for a sufficient amount to operate successfully. In all these letters it was fully understood that Wineburgh himself was taking the contract if he got it, and was merely doing business in the name of these companies. He said he would meet the objections of the trustees by increasing the capital to $250,000 and would put up the security demanded of $100,000 or would raise it to $250,000 in gilt-edge bonds. Whatever was his willingness, the fact remains according to his own testimony that he was repeatedly told by the trustees and their agents that he had overbid his hand; that they did not think he could swing the contract; and that he had better submit another bid or reduce the one he had already put in. To give his exact words, he said, " They figured that I could not make money and asked me a number of times if I was sure I had not overbid." To H. Ware Barnum, the counsel for the road, he said, " Well, I am worth a million dollars, and I offered to show Mr. Pingree — take him down to my safe deposit box and show him gilt-edge securities." Barnum said, " Well, Mr. Wineburgh, are you willing to sign a contract with our company personally? " And Wineburgh said, " No; " then Barnum said, " If you are willing to put in all the money that is necessary to run the business, why don't you sign it yourself? " Wineburgh replied, " Why of course there is always business chances. I have got my wife to think of and at my age [he was approaching seventy] I don't want to hazard all the money that I have accumulated."

Mr. Wineburgh relates a conversation he had with the trustees who were questioning him about the size

of his bid. " He [Mr. Powers] then afterwards asked me why I wanted that contract. I guess he referred to my age or something, and I told him that I wanted it to make money, that I had two sons; one of my sons was in the business and he liked it very much and I wanted the business for my sons, as they both wanted to be business men and they both felt they would like to be in the advertising business."

The trustees desired to see his contracts with the Pennsylvania railroad and he sent them copies. They also knew that he had lost a contract with the Philadelphia Rapid Transit Company in May of 1925. He thinks he told the trustees all about it. Burnett, a witness for the plaintiff, in deposition form, said he understood that the disagreement among the trustees was that some bids were made by irresponsible parties absolutely and that they should be thrown out. Others thought that as long as they were the highest they should get it. This in substance is the relation between Mr. Wineburgh and the trustees and their agents regarding his bid of $7,080,000 — $1,680,000 over the Collier bid. We at least are sure of the fact that the trustees were skeptical of Wineburgh's ability to swing this contract which was four times as large as the one he had in the suburban roads for the Pennsylvania railroad.

Now we turn to the trustees' relationship with the Collier concern because, as we have said before, these trustees were under no obligation to give the contract to Wineburgh but could legally give it to the Eastern Advertising Company or Barron Collier if they chose to do so. We must recognize, as does every business man, that people like to do business with those whom they know personally, especially if they have rendered satisfactory and faithful service. The Collier organization was friendly with the trustees and closely connected with them in many ways. For ten years they had been serving the road in this particular line of activity. We

can well imagine that, excepting the price, they would prefer Collier to Wineburgh. The Eastern Advertising Co., Inc., had a capitalization of $100,000, with $300,000 cash in the bank. Behind it stood other large advertising corporations ready to give it financial support. The Barron Collier companies were the largest in the country, doing at least eighty to eighty-five per cent of the business.

Burnett, associated with Collier and Elliott in the Eastern Advertising Co., Inc., and owning a quarter of the stock, was the brother-in-law of Charles S. Choate, one of the leading lawyers of Boston, and the attorney for the company. Burnett had a great deal of influence in Boston. He went with his brother John to introduce Mr. Collier to Governor Fuller. The reason is not stated, but no doubt it was to influence his friends to have the contract awarded to the Eastern Advertising Co., Inc., or to have it stay where it had been. Burnett knew Powers, the chairman of the board, for over thirty years. His brother was originally a prominent official of the elevated road; in fact, he was secretary for fifteen or twenty years. His dearest friend was Mr. Gaston, who had been president of the elevated. Mr. Choate appeared before the board, to whom he was well known, and discussed the awarding of the contract, referring as matter of argument to the financial ability of Collier satisfactorily to meet his obligations as compared to the uncertainty surrounding Wineburgh's companies. All these relationships necessarily played an important part and must have had an influence with the board.

Let us assume, even if it is not clear and apparent from the evidence, that political influence was brought to bear, that friends persuaded, and that well-known counsel argued regarding the letting of this contract. There is nothing in all these matters which is unfair competition or foreign to present business competitions. Competitors for a large contract or the purchase or sale of goods are in a struggle and a fight not only for business

but sometimes for very existence and all kinds of methods are devised for creating a favorable impression or an advantage. Whatever we may personally think about these selfish, fierce and unfriendly contests for gain and for profit, the law is indifferent. Not until false, fraudulent and malicious methods are used to kill off a competitor does the law take notice.

We now come to that part of this case wherein the plaintiff claims the defendants used unfair methods, and it is founded upon a letter dated February 25, 1925, written by Elliott to Edward Dana, the general manager of the railway company. This was seven months before the plaintiff submitted its bid. It begins as follows: " Referring to the renewal of the advertising privileges in and upon the cars and stations of the Boston Elevated Railway Company, you are undoubtedly aware of the fact that our company has operated the exclusive advertising privileges with your company for the past thirty-one years. During that time we have made five or six renewals and each time these renewals were made, we always gave your company the highest amount that was offered by anyone and we are now ready to not only pay you a price over and above any legitimate offer, but will date the new agreement back to January 1, 1925, which will of course give your company an added income between that date and May 1, 1926." Then follows a discussion of matters not pertinent to the present discussion till we come to the paragraph about which the complaint is made, and that reads as follows: " For your own information I wish to inform you there are only two companies of any size who operate street car advertising in the United States. The Eastern Advertising Company (ours) and Barron G. Collier, Inc. These two companies operate 95% of the street car advertising, not only in the United States, but also in Cuba and Mexico. I would exempt the subways in New York City. This company is operated by an old man 74 years of age

who has noticeably incompetent men under him and from what we hear there will soon be a change regarding this lease. *The other active competitor or operator has gradually lost every privilege he ever had in the street cars and is now running the advertising privileges in small steam railroad. I think Mr. Mitten of Philadelphia could give you the reasons for this.*

" *There has been an erroneous idea that there was an offer that was higher than ours. There never was,* and as I have stated before in this letter those interested in this company always gave you the most money that was ever offered."

The part in italics has reference to the plaintiff or to the man behind the plaintiff, Mr. Wineburgh, and it is said that these statements were false and malicious. The plaintiff must prove them to be such or he has no case.

The first statement is that this competitor " has gradually lost every privilege he ever had in the street cars and is now running the advertising privileges in small steam railroad." In the beginning of his testimony Mr. Wineburgh told of the street car advertising which he had done in various cities and which he had ceased to hold. He also told about losing the contract in May of 1925 with the Philadelphia Rapid Transit Company. He also stated that the only contract he then had was with the Pennsylvania road for suburban service. These statements, therefore, of Elliott, while not exact in every particular, were far from being false. That they were not malicious, that is, done with the sole intent to injure, is evident from the fact that reference is made to Mr. Mitten of Philadelphia, who could give the reasons for Wineburgh being unable to hold on to his contract. There is nothing wrong about this, and as long as a competitor states facts and not falsehoods, he is within his rights as a business rival.

Again it is said that Elliott misrepresented, when he said that the Collier companies operated ninety-five per

cent of the street car advertising. This was a little high. It is now said that the percentage should have been eighty or eighty-five per cent. Exaggeration, puffing, boasting appear to be the very breath of salesmanship. We never expect detraction, always over emphasis. Elliott was a little bit too boastful, but he was bragging about his own business, which, if not commendable, is at least not unusual. Surely the trustees were not deceived by these statements after having done business previously with Collier's companies for so long a time. Counsel upon the argument of this case very frankly stated that no one of these charges of malicious interference was in and of itself sufficient to prove his cause, but he said the accumulation of the little things might lead to the assumption or the conclusion that unfair practices had been resorted to. No amount of zeros can produce aught but zero, and these trifling misstatements, exaggerations, added together with statements of facts comparatively true, cannot make out a cause of action.

Other elements, however, were added to the statements made in this letter. During the course of the negotiations, contrary to the views of Mr. Barnum, the attorney, the trustees proposed that Collier and Wineburgh get together, and they did, so far as meeting at the Democratic Club and the Union League Club in New York city, for the purpose of discussing how they could combine. Who was to blame for failure in the negotiations is now immaterial. The trustees were notified by Wineburgh that negotiations had fallen through. Thereafter, the trustees executed the contract with Collier as heretofore stated, his bid being increased. Before that, however, on November 25, 1925, Elliott, in behalf of the Eastern Advertising Co., Inc., referring to the new bid, read a letter closing with this paragraph: " This Company agrees and binds itself to hold harmless against any suit growing out of the rejection of any bids of Sept. 15th and award of this contract to us not only the Boston Elevated Railway Company but

any and all Trustee of the Boston Elevated Railway Company, this Company in addition binds itself to endeavor to effect a settlement with Mr. Henry Weinburgh to the fullest measure of its ability and to the extent and in the manner described by our Mr. Collier before your Board."

This was done on the advice of counsel. Wineburgh had threatened suit against the Boston Elevated Railway Company and the trustees. They were anxious to have Collier settle this difficulty or pay any damage Wineburgh might be entitled to, if any. Collier kept his word. After he was awarded the contract he tried to settle with Wineburgh and offered various propositions to no effect. Wineburgh preferred apparently to seek his damages at law, and thereupon commenced an action in the Federal courts of Boston against the Boston Elevated Railway Company for damages for breach of contract. The case was tried and the complaint dismissed in an opinion by Judge BINGHAM of the United States Circuit Court of Appeals, First Circuit, affirming the District Court. As stated at the beginning of this opinion, Wineburgh appears all through these litigations to have been moved with the idea that because his bid was the highest the Boston Elevated Railway trustees were under some obligation to award him the contract; that their preference for Collier was a breach of good faith for which the law would award damage. Further, the plaintiff says that Collier's people told the trustees that the plaintiff could not carry out the contract as he would have to get his advertising clients from Collier. This spoke for the future and was a mere matter of opinion regarding each other's business. We find the plaintiff falling into the same line of cheap talk through its president. Wineburgh told the trustees that it was a disgrace the way Collier had been handling their advertising business.

One other element in the case needs mention. When at one of their conferences Wineburgh asked Collier,

"How many people did you have to bribe to get this contract?" he says that Collier threw up his hands and said, "My God, Henry, don't ask me." There is no evidence beyond this remark that anybody was bribed and the judge so instructed the jury or at least told them that there was no evidence that anybody in authority to award the contract had been bribed. Whatever this may add in the way of guess or surmise it contributes nothing to the evidence in the case bearing upon the derogatory or false statements made about the plaintiff.

To entitle the plaintiff to recover in an action like this it must prove that it *would* have procured and received the contract but for the wrongful and illegal interference of the defendants. That the defendants interfered there is no question. Of course they did. They were competitors and they interfered successfully to themselves. They fought the plaintiff at every point, no doubt bringing much influence to bear in their favor. The interference of a competitor creates no cause of action. The thing the law looks for and seeks to redress when found, is fraud, deceit, false charges made against the competitor. In analyzing this testimony, not fully and completely, but in its salient and material points, we are of the opinion that the plaintiff has failed to prove that these trustees of the Boston Elevated Railway Company would have awarded it the contract. As we have said, the evidence indicates that the trustees were not satisfied with the standing and ability of Wineburgh or his companies, in whose name he was doing business, to fulfill and carry out the contract.

The judge charged the jury as follows: "The basis of the plaintiff's claim is that the defendants maliciously and for the purpose of preventing the plaintiff from obtaining the contract which it otherwise had a reasonable expectation of obtaining so interfered with the plaintiff's endeavors to secure the contract as to amount to unfair competition." Later he used the expression, "from

entering with him into a contract which it is reasonably certain would have been made but for such interference." If these words mean anything less than " would have received," we think they go too far. A cause of action exists where an executed contract is broken by a third person's unlawful interference. (*Lamb* v. *Cheney & Son*, 227 N. Y. 418.) A cause of action has also been recognized where a party *would* have received a contract but for the malicious, fraudulent and deceitful acts of a third party, such, for instance, as materially lying about him. (*Morgan* v. *Andrews*, 107 Mich. 33; *Debnam* v. *Simonson*, 124 Md. 354; *Skene* v. *Carayanis*, 103 Conn. 708; *Lewis* v. *Bloede*, 202 Fed. Rep. 7; Nims on Unfair Competition and Trade-Marks [3d ed.], § 176; *May* v. *Wood*, 172 Mass. 11, p. 14.) There must be some certainty that the plaintiff would have gotten the contract but for the fraud. This cannot be left to surmise or speculation. The courts rightfully extended the arm of the law to reach one who deliberately interfered with an executed contract (*Lumley* v. *Gye*, 2 E. & B. 216), since which time they have gone a step further and mulcted in damages him who does the same thing to one who *would* have received such a contract but for the illegal interference. (See above cases.) The courts will be a little slow in permitting juries to speculate upon what a competitor had reason to expect or might reasonably suppose would happen. The expressions " reasonable expectation " or " reasonably certain " may not be as precise as " *would* have received," and we think the latter words are preferable. While not finding reversible error in this part of the charge to the jury, yet we call attention to this phraseology in order that there may be no misunderstanding in the future.

There may be one or two other elements in the evidence which have been omitted, but I am sure that we have touched upon the main features. As we said in the beginning, so at the close — from no point of view can

we see wherein the plaintiff has made out a cause of action.

The judgment of the Appellate Division and that of the Trial Term should be reversed and a new trial granted, with costs to abide the event.

POUND, Ch. J., LEHMAN, O'BRIEN, HUBBS and CROUCH, JJ., concur; KELLOGG, J., not voting.

Judgments reversed, etc.