WILLIAMS & Co., INC., Appellant, *v.* COLLINS TUTTLE AND COMPANY et al., Respondents.

First Department, July 1, 1958.

*Sol Neil Corbin* of counsel (*Frederick F. Greenman* and *Louis W. Goodkind,* with him on the brief; *Greenman, Shea & Zimet,* attorneys), for appellant.

*Bernard Sobol* of counsel (*Hilliard L. Bernstein* and *Philip Feldman,* with him on the brief; *Conboy, Hewitt, O'Brien & Boardman,* attorneys for Madison-59th Street Corp.; *Pindyck & Bernstein,* attorneys for Emil Mogul Co., Inc.; *Reich, Spitzer & Feldman,* attorneys for Collins Tuttle and Company and others), for Collins Tuttle and Company and others, respondents.

*William M. Kufeld* of counsel (*Sydney A. Luria* with him on the brief; *Carb, Luria, Glassner & Cook*, attorneys), for Cushman & Wakefield, Inc., and another, respondents.

BREITEL, J. P. Plaintiff broker sues for loss of its commissions and under penal statutes for penal sums consequent upon an alleged tortious scheme effected by the several defendants — owner of a building, the rental agent of the building, a second broker, a tenant, and a number of individuals associated in various capacities as principals or officers of the partnership and corporations involved as defendants. By five separate orders the amended complaint, consisting of three causes of action, was dismissed.

The orders dismissing the first cause of action for insufficiency should be reversed, and the motion denied. The order dismissing the second and third causes of action should be affirmed.

The allegations of the amended complaint are taken as true, for purposes of the motions and the appeal, although it is reasonable to assume that the principal allegations were and will be vigorously denied.

The ultimate issue in this case is whether a broker, in order to recover a loss of commissions sustained through intentional tortious interference with its opportunity to earn those commissions must, in addition to establishing the basic elements of the tort, also establish by pleading allegation that it would have closed on the same or a substantially similar contract to that ultimately made with the prospect. In applying the principle the question then is whether the negotiations with the prospect must have reached virtual consummation; or whether it is sufficient that it would have concluded the contract although the negotiations fell short of consummation only because of the tortious interference. Not involved is what plaintiff must prove in order to establish its damage. The test for that has been well settled in the courts of this State, and the test is undisputed, at least in this court. Plaintiff must establish that it " would have received the contract " which it sought to obtain at the behest of its principal. Injected into the case is the view that in real estate brokerage cases, because of the prevalence of false claims for commissions, actions should be throttled at the outset, before there has been even an opportunity for pretrial discovery, unless the broker's pleading establishes in particular, and even evidentiary detail, the circumstances identifying the contract which it claims it would have received with the contract ultimately made with the prospect.

The essence of the first cause of action is briefly stated. The rental agent* for the owner's office building solicited real estate brokers generally for tenants. Plaintiff, the first broker, obtained a prospective tenant, an advertising agency, which wished to lease a full floor. Although at first the owner and rental agent found the tenant acceptable for the leasing of a full floor, and said so, they subsequently falsely stated to plaintiff broker that the tenant was not acceptable because it would be objectionable to another tenant, also an advertising agency. This false statement was part of a plan to obtain a kickback of commissions, which aggregated $25,075.

Pursuant to the plan, the rental agent arranged with the second broker, who was knowing and compliant, to supplant the first broker and act as broker between the same tenant and owner to complete the deal. The negotiations were brought to a conclusion by the participants in the plan; the lease signed; the second broker paid off the owners and rental agent and various principals thereof; and to sweeten the deal for the "kickbacking" second broker, the tenant paid them part of their "loss" ($10,000). Everyone got what he wanted, except the first broker, who had brought the prospect to the participants in the plan, only to be frozen out intentionally.

The pleading explains that this plan was conceived, and then executed in concert by all the defendants, because the first broker did not offer to kickback on the sizeable commissions involved. Such kickbacks would have been a violation of the statutes (Real Property Law, §§ 442, 442-a, 442-e). Plaintiff's position, then, is that it has suffered an intentional injury because of an illegal design to effect a kickback of commissions and by misrepresentation as to tenant's acceptability. Because of such illegal design and the fraudulent means used, it is urged that defendants' conduct was not privileged.

The questions involved are as simple as the plan conceived and executed by defendants.

The first question is whether this case falls within the principle that a broker may not be deprived of his commissions by

---

* Rental Agent:     Defendants Collins and Tuttle, and the corporation and partnership bearing their combined names.

Owner:     Defendant Madison-59th Street Corp.

Tenant:     Defendant Emil Mogul Co., Inc.

First broker:     Plaintiff Williams & Co., Inc.

Second broker:     Defendants Cushman & Wakefield, Inc. and Griffin, vice-pres. and salesman of the defendant corporation.

substituting another broker before final consummation or execution of the contract between the principals, by fraudulent means, or unless he kicks back a part of the commissions (*Keviczky* v. *Lorber,* 290 N. Y. 297; *Horn* v. *Isbrandtsen Co.,* 4 A D 2d 855). In the *Keviczky* case the tortious acts occurred on the eve of the consummation of the contract between the principals. In the *Horn* case, as in this case, the planners saw to it that the first broker was eased out while the negotiations appeared inchoate although the potential was definite.

The second question is whether, a first broker, frozen out by fraudulent means and a concerted design to obtain a kickback in commissions, must allege in his complaint, not only the ultimate fact that he would have earned his commissions save for the tortious conduct of defendants, but must also specify in exact detail, the circumstances which would prove, on a trial, that his success was otherwise inevitable.

It would seem that the answer to both questions should favor plaintiff's position. The courts have long passed beyond the immunizing of scheming wrongdoers merely because the latter were farsighted and fleetfooted enough to avoid obvious categorical liability for harm intended and inflicted (cf. e.g., *Rice* v. *Manley,* 66 N. Y. 82; *Ultramares Corp.* v. *Touche,* 255 N. Y. 170; *Union Car Advertising Co.* v. *Collier,* 263 N. Y. 386; *Advance Music Corp.* v. *American Tobacco Co.,* 296 N. Y. 79; *Duane Jones Co.* v. *Burke,* 306 N. Y. 172; *A. S. Rampell, Inc.* v. *Hyster Co.,* 3 N Y 2d 369).

Thus, in the *Keviczky* case. (290 N. Y. 297, 306, *supra*) the Court of Appeals imposed no limitation on the general principle when it quoted: " ' [An attempt to injure, or] [a]n injury to, a person's business by procuring others not to deal with him, or by getting away his customers, if unlawful means are employed, such as fraud or intimidation, or if done without justifiable cause, is an actionable wrong.' " (See, also, 9 A. L. R. 2d 288.)

Where liability is to be imposed for preventing one from making a particular contract, the courts have required more than a showing of qualified probability that the contract would have been completed but for the tortious interference. As a consequence plaintiff must allege at least that " it would have received " the contract. But it is a distortion of the rule to require that the negotiations for the prospective contract reach the conclusive stage. It is sufficient that the allegations and proof entitle plaintiff to submit the issue of damage to the jury. Such right arises from allegation and proof that the negotia-

tions would have been concluded, not that they were concluded for all practical purposes.

So, in the *Union Car* case (263 N. Y. 386, 401, *supra*), it was said: " A cause of action has also been recognized where a party *would* have received a contract but for the malicious, fraudulent and deceitful acts of a third party, such, for instance, as materially lying about him. (*Morgan* v. *Andrews*, 107 Mich. 33; *Debnam* v. *Simonson*, 124 Md. 354; *Skene* v. *Carayanis*, 103 Conn. 708; *Lewis* v. *Bloede*, 202 Fed. Rep. 7; Nims on Unfair Competition and Trade-Marks [3d ed.], § 176; *May* v. *Wood*, 172 Mass. 11, p. 14.) There must be some certainty that the plaintiff would have gotten the contract but for the fraud. This cannot be left to surmise or speculation. The courts rightfully extended the arm of the law to reach one who deliberately interfered with an executed contract (*Lumley* v. *Gye*, 2 E. & B. 216), since which time they have gone a step further and mulcted in damages him who does the same thing to one who *would* have received such a contract but for the illegal interference. (See above cases.) The courts will be a little slow in permitting juries to speculate upon what a competitor had reason to expect or might reasonably suppose would happen. The expressions ' reasonable expectation ' or ' reasonably certain ' may not be as precise as ' *would* have received,' and we think the latter words are preferable. While not finding reversible error in this part of the charge to the jury, yet we call attention to this phraseology in order that there may be no misunderstanding in the future." (Emphasis in original.) (For collected relevant cases, see 99 A. L. R. 20–21; but see, also, *Portman* v. *Burack*, 265 App. Div. 959, affd. 290 N. Y. 686; *Newberry & Co.* v. *Warnecke & Co.*, 267 App. Div. 418, affd. 293 N. Y. 698.)

The " would have received the contract " test is a stringent one. It involves a higher standard of proof than what lawyers call mere probabilities, although logicians and jurists have recognized that all that is within the possible is a matter of probabilities. It is even a more stringent test than " reasonably certain " or " reasonable expectation ", both of which expressions were rejected in the *Union Car* case (*supra*). But stringent as the test is, it should not be equated with a requirement that the negotiations must have been all but concluded before interference may create actionable liability.

Turning now to the second question, the issue is whether plaintiff is bound to plead in exact detail the circumstances which, on a trial, would prove that its success would have been

inevitable but for the tortious acts of defendants. The day never existed in our jurisprudence when the courts required plaintiff not only to state a cause of action but also establish in the pleading that he could prove it. With rich development in pretrial discovery it becomes even more important that issues not be resolved on pleadings alone, but rather by evidence adduced upon trial (or, at least, on motion which exposes the evidence).

True, plaintiff will have to prove that the alleged tortious interference (namely, the fraudulent misrepresentation, the design for kickbacks, and the concerted action) caused the loss of commissions. Indeed, it must show that it lost commissions and not merely a wishful dream of commissions. In this connection the proof as to the stage reached in the negotiations with the tenant will be material, and even critical. But, again, there is no arbitrary dividing line which demarks one stage of negotiations from another which, as a matter of law, must be reached before damages can be proven.

There is nothing special about real estate brokerage which suggests or requires that protection be denied because the intentional injury is inflicted by means which anticipate, rather than await, future development of pending negotiations. If the intent and predatory scheming of defendants were deliberate and effective enough to exploit the first broker's efforts, short of consummation, and were so designed, the necessary link of causation and incidence of damage may be supplied and liability for such purposeful and effective interference imposed. Thus it was that this court sustained the complaint in *Spitzer* v. *Sachar* (4 A D 2d 53) and distinguished *Portman* v. *Burack* (*supra*) and *Newberry & Co.* v. *Warnecke & Co.* (*supra*). This too was the principle applied in *Horn* v. *Isbrandtsen Co.* (4 A D 2d 855, *supra*).

It is to be stressed that the *Keviczky* case (290 N. Y. 297, *supra*) was determined after trial. It is because it was after trial that details of proof were considered in evaluating the sufficiency of the evidence to satisfy both the pleading and the applicable substantive rule of law. So too, the *Union Car* case (263 N. Y. 386, *supra*) was a determination after trial, and the concern was primarily with the proper charge to a jury in resolving issues of fact. Neither case involved pleading requirements. Nevertheless, both in this case and in the *Horn* case, as already pointed out, the pleadings express the ultimate fact required to invoke the very rule expressed in the *Union Car* case and applied in the *Keviczky* case. Thus the detailed mat-

ters of proof at the trial further considered in the *Keviczky* case should not and were not intended to be imposed as refinements of pleading. Moreover, this court required no more in the *Horn* case.

Thus, it is not true that the complaint in the *Keviczky* case rested upon the closing of a transaction upon the same terms and conditions reached in the prior negotiations. There was no such allegation. The *Keviczky* complaint alleged generally that "defendant Lorber negotiated for the purchase of said premises with the defendant Drydock and agreed upon all the terms and conditions thereof". There were no details or other facts about the terms. These were later supplied in the bill of particulars. Nor did the complaint contain any allegation that Lorber ultimately took the premises on the same or similar conditions to those negotiated by Keviczky. Actually, insofar as the trial proof is concerned, there was a variation in the terms and conditions between the consummated contract and the tortiously frustrated negotiations. Moreover, Keviczky never learned the correct details of the consummated transactions until examinations before trial had been conducted. All of this is crucial to the question of pleading in this case in which there is yet to be any pretrial examination or bill of particulars.

Turning to the *Horn* case, while there are allegations of an exclusive agency, it is made clear in the complaint that the exclusive agency had long terminated before the procuring of the defendant purchaser. More important, there was no allegation in the *Horn* complaint that the terms of sale arranged by plaintiff were substantially similar to those upon which the transaction was consummated. Rather, there was careful avoidance of any such assertion and in its place only the allegation, referring to third parties never identified, "that the terms of sale * * * were substantially similar to offers of proposed purchases by others submitted by plaintiff to the defendants". To stress a comparison of the terms of the prior negotiations with the terms of the ultimate sale is to confuse persuasive matters of proof with essential elements of the cause of action. Conceivably, as in the *Keviczky* case, there may be a variation in the terms, but the court may find the variation insubstantial or immaterial, and the interference, no less intentional, destructive, and therefore actionable.

In the *Horn* case (*supra*), so recently decided by this court, the complaint alleged: "Upon information and belief, that plaintiff would have completed a successful negotiation of a

sale * * * had not the defendants by their acts as aforesaid prevented the continuation of the negotiations and the consummation of the transaction ''.

Here, the allegation is: '' [I]f the plaintiff had not been prevented from continuing to act as broker in the said negotiation up to the time of execution of the aforesaid lease, it would have earned and become entitled to a commission ''. Thus, in both cases the tortious interference occurred while the negotiations were still pending but evidently with sufficient promise of conclusion to entice the predatory scheme. There, as here, defendants argued that plaintiff's failure to allege virtual agreement before the acts of interference occurred required dismissal of the complaint. That contention this court abruptly rejected, saying: '' The complaint sufficiently alleges and the plaintiff should be given an opportunity to prove that he would have completed the successful negotiations and the sale had not defendants prevented him from doing so by their tortious conduct ''. In so holding this court did no more than apply the principle and the language of the *Union Car* case (*supra*), the very authority that grounded the conclusion of the Court of Appeals in the *Keviczky* case.

In addition to the principles already discussed, there are two other aspects of the present case that bear vitally upon whatever privilege defendants might have to inflict incidental harm upon another as they engage in their own activities. First, it was the defendants, owner and rental agent for the property, who activated plaintiff in its endeavors to find a tenant and effectuate a lease. Implied in such solicitation is the condition that they will not intentionally interfere with plaintiff's efforts. In other words, good faith is always implied in such an undertaking (cf. *Patterson* v. *Meyerhofer*, 204 N. Y. 96, 101; *Wood* v. *Duff-Gordon*, 222 N. Y. 88, 90–91). Thus, it is true that the owner and the rental agent could have discharged the first broker at any time, or used another broker, provided they did so without dishonest or illegitimate purpose. But when they discharge it, use another broker, or seek to bring about the termination of its activities, by fraud or by illegal design to procure the kickback of commissions, liability may attach.

Another aspect of the case, which is quite material, relates to the second and third causes of action in the amended complaint. The court is agreed that they should remain dismissed as insufficient. These causes of action purport to derive from the statutes making the kickback of commissions in real estate transactions illegal, and indeed, even criminal. Neither Special

Term nor this court believes the kickbacks here involved are legal, but it is held that plaintiff is not a party aggrieved within the meaning of the statute, as presently worded, providing civil penalties. (Real Property Law, §§ 442, 442-a, 442-e.) Nevertheless, the illegal design has significant bearing on the wrong alleged in the first cause of action and, particularly, on whether defendants' interference with plaintiff's prospective commissions was privileged or not.

Accordingly, the orders granting the motions to dismiss the first cause of action should be reversed, on the law, and the motions denied, with costs to plaintiff-appellant; and the order granting the motions to dismiss the second and third causes of action should be affirmed, with costs to defendants-respondents Cushman & Wakefield, Inc. and Charles E. Griffin.

M. M. FRANK, J. (dissenting). The identification of the respective parties in this litigation, contained in the footnote appended to the majority opinion, obviates the need for repetition here.

We agree that the order dated December 10, 1956, which granted the motion of the defendants, Cushman & Wakefield, Inc. and Charles E. Griffin, to dismiss the second and third causes of action, should be affirmed.

As we read and analyze the complaint, the first cause of action charges that during 1955 the managing agents of 625 Madison Avenue solicited real estate brokers in the city of New York, including the plaintiff, by a representation and a promise to each that if a prospective tenant were procured, who would enter into a lease for office space with the defendant owner, such broker would become entitled to commissions in accordance with the rates established by the real estate board. In June, 1955, the defendant Mogul employed the plaintiff to find office space and negotiate a lease for it, with the understanding that the plaintiff would be entitled to receive the commission from the lessor. During the month following, the plaintiff informed Mogul of the possibility of obtaining space at 625 Madison Avenue. Mogul authorized the plaintiff to negotiate a lease for a floor in that building. On August 5, 1955, a meeting of representatives of Collins Tuttle, Mogul and the plaintiff took place, at which Mogul furnished financial information to the managing agents and offered to lease an entire floor in the building "upon terms which the said defendant C. T. Co. [managing agents] agreed to discuss with the defendant Madison" (owner). Thereafter, in the same month, Collins Tuttle assured the plaintiff that Mogul was acceptable as a tenant

and would obtain space in the building. However, in September, 1955, Collins Tuttle informed the plaintiff that the defendant Mogul was not acceptable as a tenant, "for the reason that such tenancy would be objected to by another advertising agency which had, by that time, leased space in the said building." It is charged that the latter statement was false and was made because the plaintiff "*had failed to offer and agree to pay a 'kickback'*" (emphasis supplied) to the managing agents and the owner. The pleading alleges that the defendants conspired to deprive the plaintiff of a valuable asset in its business by interfering and refraining from dealing with it in the further negotiation of a lease on behalf of Mogul, thereby depriving the plaintiff of the opportunity to earn the commissions which it otherwise would have received from the owner. Thereafter, the plaintiff was excluded from further participation in the negotiation and completion of the lease transaction which it had initiated. In furtherance of the scheme and design, the defendant Cushman & Wakefield continued the negotiations, a lease was consummated, and some of the defendants shared the commissions.

It is not without significance, that nowhere in the pleading is there an allegation that the lease involved the same space or that the terms of the agreement were the same or similar to those discussed by the plaintiff with any of the defendants.

The plaintiff contends that the complaint under attack is sufficient to bring it within the orbit of the rule in *Keviczky* v. *Lorber* (290 N. Y. 297) and *Horn* v. *Isbrandtsen Co.* (4 A D 2d 855) and strenuously asserts that no extension of the rule in the cited cases is required in order to sustain the pleading.

In the *Keviczky* case it was pleaded, and found as a fact after trial on the merits, that the transaction was closed upon the same terms and conditions as arranged by the plaintiff. Had it not been for the conspiracy to obtain a kickback of part of the commissions, for which purpose another broker was obviously injected into the transaction at the eleventh hour, the plaintiff would have earned and received his compensation.

In the *Horn* case there were allegations of an exclusive agency and an agreement expressly recognizing and protecting the plaintiff as the broker in the event of a sale to the very purchaser who actually acquired the property. The terms of sale arranged by the plaintiff were substantially similar to those upon which the transaction was consummated, and Horn's negotiations had reached a point so close to finality that he was about to conclude the affair successfully. It was charged that

the defendants conspired to defraud the plaintiff and deprive him of his opportunity to complete the negotiations, and to that end the purchaser advised the plaintiff that it was no longer interested in the premises but negotiated instead through another broker. Finally, it was alleged that in furtherance of the conspiracy and as evidence thereof, an indemnification agreement was executed by the defendants to reimburse the seller in the event that they were compelled to pay the plaintiff any commissions or compensation in connection with the transaction.

It will be observed that the complaint in this action does not contain allegations of fact approximating those pleaded in the *Keviczky* and *Horn* cases. The pleading goes no further than to claim that the proposed lessee submitted a financial statement and offered to lease an entire floor upon terms which the managing agent agreed to discuss with the owner, and that the plaintiff was assured that Mogul was acceptable as a tenant and would obtain space. There is no allegation that definite space or terms had been discussed and that the lease as finally executed was for the same or similar space and term. Nor is there an allegation that the plaintiff had been requested to kickback or split commissions, the pertinent paragraph in the complaint merely charging that the assertion by the managing agent that Mogul was not acceptable as a tenant was false and was made '' because the plaintiff had failed to offer and agree to pay a ' kickback ' ''. This allegation is purely conclusory, and obviously based on an antecedent assumption that a false statement was made to it because it failed to offer to split its commissions. To express it differently, instead of pleading operative facts, the pleading leaves it to us to assume that the transaction was closed on the same or similar terms as the plaintiff had offered, and that the defendants ousted the plaintiff because it failed to submit to an *unexpressed* demand to split commissions. The allegation actually pleaded either requires occult powers or speculation completely unsupported by facts. (See *Paramount Pad Co.* v. *Baumrind,* 3 A D 2d 655.)

Appropriate here, therefore, is the statement of the Court of Appeals in *Union Car Advertising Co.* v. *Collier* (263 N. Y. 386, 401) that '' A cause of action has also been recognized where a party *would* have received a contract but for the malicious, fraudulent and deceitful acts of a third party, * * * lying about him. * * * There must be some certainty that the plaintiff would have gotten the contract but for the fraud. This cannot be left to surmise or speculation. * * * The courts

will be a little slow in permitting juries to speculate upon what a competitor had reason to expect or might reasonably suppose would happen. The expressions ' reasonable expectation ' or ' reasonably certain ' may not be as precise as ' *would* have received,' and we think the latter words are preferable.''

This requirement cannot be supplied by mere statements of conclusion or opinion on the part of the pleader. (*Newberry & Co.* v. *Warnecke & Co.*, 267 App. Div. 418, affd. 293 N. Y. 698; *Portman* v. *Burack,* 265 App. Div. 959, affd. 290 N. Y. 686; *Spitzer* v. *Sachar,* 4 A D 2d 53.) It is not enough that the plaintiff may have been the first one to bring the property to the attention of Mogul or that it was the first to initiate negotiations. (*Sibbald* v. *Bethlehem Iron Co.,* 83 N. Y. 378, 384; *Byrne, Bowman & Forshay* v. *488 Madison Ave.,* 11 Misc 2d 587, affd. 286 App. Div. 826.) The pleading must sufficiently allege facts establishing that the negotiations had progressed to a point where the transaction would have been completed and the plaintiff would have earned its commissions, except for the unlawful interference by the conspirators that resulted in depriving the plaintiff of the business opportunity.

Nor do the allegations of conspiracy supply the necessary factual allegations absent in this pleading. A civil conspiracy to commit an actionable wrong is not, without more, a cause of action in itself. The tortious liability rests in the commission of a wrongful act or of a legal act by wrongful means, and not merely upon the agreement to commit the prohibited act standing alone. (See *Green* v. *Davies,* 182 N. Y. 499, 504; *Rhodes* v. *Ocean Acc. & Guar. Corp.,* 235 App. Div. 340; *Cohen* v. *Fisher & Co.,* 135 App. Div. 238; *Moskin* v. *Lyden,* 200 App. Div. 304; *Miller* v. *Spitzer,* 224 App. Div. 39.)

To accept the plaintiff's argument that it need only establish the "probability" that it would have been as successful as Cushman & Wakefield, Inc. in consummating the lease, is to ignore *Union Car Advertising Co.* v. *Collier* (263 N. Y. 386) and *Horn* v. *Isbrandtsen Co.* (4 A D 2d 855, *supra*) where we held that the plaintiff was entitled to the opportunity to prove " that he would have completed the successful negotiations and sale had not the defendants prevented him from doing so by their tortious conduct.'' There is a distinction between probabilities and reasonable certainties.

Our view with respect to this pleading goes to substance and pays no obeisance to the fetish of form. All of our courts properly endeavor to give liberal construction to pleadings. In doing so, however, we have not abandoned the requirements of

the Civil Practice Act (§ 241) that the pleading shall contain a recital of the material facts. (See *Al Raschid* v. *News Syndicate Co.,* 265 N. Y. 1.) It is, of course, needless to say that a plaintiff is not required to prove his cause of action in his complaint. That does not mean, however, that it is unnecessary to state a cause of action and that we may supply the missing elements in order to hold it good.

The real question here is not whether the complaint presents a technical deficiency in its drafting but whether the omissions in the pleading demonstrate the absence of a substantive case. There are certain types of actions where there has been insistence upon pleading the facts, rather than conclusions. For instance, stockholders' derivative actions represent such a class of actions where the courts scrutinize a complaint more carefully and exact factual allegations rather than conclusory statements of wrongdoing and conspiracy. (See *Gerdes* v. *Reynolds,* 281 N. Y. 180; *Lifshutz* v. *Adams,* 285 N. Y. 180; *Weinberger* v. *Quinn,* 264 App. Div. 405, affd. 290 N. Y. 635; *Kalmanash* v. *Smith,* 291 N. Y. 142.) With the possibility of extensive and expensive pretrial examination in the offing, the courts have demanded more specificity in allegation where fraud and conspiracy are charged.

Real estate brokers are engaged in a competitive business and the courts have no power to hamper those engaged therein unless competitive activities become unfair. Nor may we impose liability upon owners if they uncommittedly deal with competing brokers unless they do so tortiously.

While the courts reach out to give relief to victims of actionable fraud, misrepresentations and sharp practices, we must not encourage disappointed brokers, in this highly competitive profession, who fail at the very threshold of their endeavors, to seek unmerited recovery based upon conjecture or speculation, simply because they conclusorily allege fraud, misrepresentation or interference by others, without a clear demonstration that their own efforts would have been crowned with success absent such tortious conduct.

It is not a retrogression to the formalism of common-law or code pleading to insist upon such minimum requirements in this class of actions. A broker with a valid grievance will find no difficulty in meeting the standards. A less exacting rule will inevitably result in unfounded and vexatious litigation.

For the foregoing reasons, the orders dated January 18, 1957, should be modified on the law to grant leave to replead the first cause of action and should otherwise be affirmed.

Rabin and Stevens, JJ., concur with Breitel, J. P.; M. M. Frank, J., dissents in opinion, in which Valente, J., concurs.

Order [Dec. 10, 1956] unanimously affirmed, with $20 costs and disbursements to the respondents, Cushman & Wakefield, Inc. and Charles E. Griffin. Four orders of January 18, 1957 so appealed from reversed, with $20 costs and disbursements to the appellant, and the motions of the respective respondents to dismiss the first cause of action of the complaint for insufficiency are denied, with $10 costs.