CATSKILL DEVELOPMENT, L.L.C., Mohawk Management, L.L.C., and Monticello Raceway Development Company, L.L.C., Plaintiffs,

v.

PARK PLACE ENTERTAINMENT CORP., Defendant.

No. 00CIV8660CMGAY.

United States District Court, S.D. New York.

Aug. 22, 2002.

Thomas P. Puccio, Thomas P. Puccio, Esq., New York City, for Catskill Development, L.L.C., plaintiff.

John P. Gallagher, Stites & Harbison, Atlanta, GA, for Catskill Development, L.L.C., Mohawk Management, L.L.C., Monticello Raceway Development Company, L.L.C., plaintiffs.

Bethany A. Breetz, Stites & Harbison, Louisville, KY, for Catskill Development, L.L.C., Mohawk Management, L.L.C., plaintiffs.

Herbert F. Kozlov, Reed Smith LLP, New York City, for Catskill Development, L.L.C., Mohawk Management, L.L.C., Monticello Raceway Development Company, L.L.C., plaintiffs.

Herbert F. Kozlov, Parker, Duryee, Rosoff & Haft, New York City, for Mohawk Management, L.L.C., plaintiff.

William W. Hopson, J.D. Humphries, III, Stites & Harbison, PLLC, Atlanta, GA, for Mohawk Management, L.L.C., plaintiff.

J.D. Humphries, III, Stites & Harbison, PLLC, Atlanta, GA, for Monticello Raceway Development Company, L.L.C., plaintiff.

David Boies, Boies, Schiller & Flexner, L.L.P., Armonk, NY, for Park Place Entertainment Corporation, defendant.

## MEMORANDUM AND DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR RECONSIDERATION AS MOOT

MCMAHON, District Judge.

Plaintiffs Catskill Development, L.L.C. ("Catskill"), Mohawk Management, L.L.C. ("Mohawk") and Monticello Raceway Development Co., L.L.C. ("Monticello") (collectively, "Plaintiffs" or the "Catskill Group"), bring this action in diversity against Park Place Entertainment Corp. ("Park Place"), claiming tortious interference with contractual relations and tortious interference with prospective business relationships.[1] Plaintiffs allege that Defendant, one of the world's largest casino companies, wrongfully induced officials of the St. Regis Mohawk Nation to terminate the Mohawks' contractual agreements and business relationships with Plaintiffs relating to the development and management of a proposed $500 million Native American casino at the Monticello Raceway in Sullivan County, New York (the "Casino Project").

The case is before me on Defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. Defendant also moves for reconsideration of this Court's decision of July 23, 2001, pursuant to Fed.R.Civ.P. 54(b) and Local Rule 6.3. For the reasons below, I grant Defendant's motion for summary judgment. The motion for reconsideration is denied as moot.

## FACTS PERTINENT TO THIS MOTION

The background to the dispute between the parties is set forth in this Court's earlier opinions. See *Catskill Development, L.L.C. v. Park Place Entertainment Corp.*, 144 F.Supp.2d 215 (S.D.N.Y.2001) ("*Catskill I*"), vacated in part, 154 F.Supp.2d 696 (S.D.N.Y.2001) ("*Catskill II*"). Familiarity with these opinions is assumed.

To recapitulate briefly: Plaintiffs are members of a group of businessmen and developers who, beginning in 1995, sought

---

1. Plaintiffs' claims of unfair competition, and violations of the Donnelly Act, N.Y. Gen. Bus. Law § 340 were dismissed by this Court in *Catskill Development, L.L.C. v. Park Place Entertainment Corp.*, 144 F.Supp.2d 215 (S.D.N.Y.2001), vacated in part, 154 F.Supp.2d 696 (S.D.N.Y.2001).

to build and operate a casino at a site adjacent to the Monticello Racetrack in Monticello, New York. Because gambling is illegal in New York State unless on Native American lands and under certain legal conditions, the Catskill Group became partners with the St. Regis Mohawk Tribe (hereinafter the "Tribe" or the "Mohawks") on the casino project.

On June 3, 1996, Catskill (one of the Plaintiffs) acquired 230 acres of land that contained the Monticello Raceway. Of the property purchased, 29.31 acres adjacent to the Raceway were set aside for a casino. Catskill created the other two corporate Plaintiffs to provide various services for the Raceway and the casino. Catskill acted for all three entities in seeking the necessary local, state and federal approvals needed to build and operate the proposed casino.

On July 31, 1996, the Tribe (through its Tribal Council) and Plaintiffs entered into five separate agreements. One of these agreements was a Land Purchase Agreement (the "LPA") between the Regis Mohawk Gaming Authority (the "Gaming Authority") and Catskill. The LPA contemplated the transfer of the Raceway property from Catskill to the United States government to be held in trust for the Mohawks, in exchange for which the Mohawks would pay Catskill $10 million, which was the purchase price of the entire Monticello Raceway property. The other agreements were a Mortgage Agreement, a Gaming Facility Management Agreement, a Shared Facilities Agreement and a Development and Construction Agreement.

In 1996, Plaintiffs and the Tribe began to seek the approvals necessary to begin developing the casino. By April of 2000, Plaintiffs had not yet received all the proper approvals necessary to move forward with the casino project with the Tribe.

They had, however, expended millions of dollars toward their goal.

At the same time, extensive internal warfare over tribal governance fractured the Tribe. Historically, the St. Regis Mohawk Tribe was governed by a Three Chiefs system, under which the Three Chiefs, elected by Tribe Members, acted as the Tribe's governing body. In 1995, the Tribe commenced a referendum election to determine whether it would adopt a Tribal Constitution, creating three branches of tribal government, including a Tribal Court. The terms of the Constitution provided for its own adoption upon certification if 51% of the present and voting tribal members voted in favor of its adoption. *See Park Place Entm't v. Arquette*, 113 F.Supp.2d 322 (N.D.N.Y.2000). The Tribal Clerk allegedly certified that 50.935093% of those voting were in favor of adopting the Constitution, yet certified that the Constitution was adopted by the requisite vote. *Id.* at 322–23. In June 1996 the Tribal Council rescinded certification of the Constitution following a second referendum. At the end of June, in a third referendum, the Tribe allegedly voted to elect Alma Ransom, Hilda Smoke and Paul Thompson in a "clean slate" of Chiefs, rather than retain the current Tribal Council officials. However, not all of the Tribe accepted the results of this referendum.

Sometime after mid–1999, Park Place principals were introduced to members of the Tribe. On April 14, 2000, the Tribe, through the Three "clean slate" Chiefs, entered into a written agreement with Park Place that made Park Place the exclusive developer and manager of any Mohawk casinos in New York State. *Catskill I,* 144 F.Supp.2d at 227.

This catapulted the intra-tribal dispute into court. On April 26, 2000, independent representatives of the Mohawk Tribe (in-

cluding prior chiefs), filed a class action complaint in the St. Regis Mohawk Tribal Court against Park Place, Arthur Goldberg and Clive Cummis (principals of Park Place), and the Three Chiefs who had signed the April 2000 agreement. They asked the Court to nullify the agreement and sought billions of dollars in damages. In response, the Three Chiefs declared the Tribal Court invalid, raided the Court facilities, and removed the Court's computers and files. (Compl. at 116.)

On June 2, 2000, Park Place brought suit in the Northern District of New York seeking: (1) an injunction against the Tribal Court proceeding and (2) a declaration that the Tribal Court was invalid and without authority to adjudicate the claims asserted. On September 18, 2000, Judge McAvoy dismissed Park Place's action for lack of subject matter jurisdiction. *Park Place Entm't Corp.*, 113 F.Supp.2d at 323 (noting that "significantly, the dispute does not involve a question of the limits of the Tribal Court's jurisdiction, but rather a question of whether the Tribal Court is a valid Tribal authority.") Park Place's appeal to the Second Circuit has been sub judice throughout the life of this proceeding.

On March 20, 2001, the Mohawk Tribal Court entered a default judgment against Park Place and the other defendants in the case filed before it, awarding plaintiffs $1.782 billion in actual damages and $5 million in punitive damages. The Tribal Court's opinion contains findings of fact and conclusions of law regarding the validity of various contracts and the actions of Park Place and Catskill. *See Arquette v. Park Place Entm't Corp.*, Case No. 00C10133GN, Mar. 20, 2001 (St. Regis Mohawk Tribal Court, Hogansberg, NY). Park Place has advised the Court that it views this judgment as a nullity. For reasons discussed in *Catskill I*, Defendant

is not collaterally estopped from arguing the validity of these contracts because of the findings of the Tribal Court. *Catskill I*, 144 F.Supp.2d at 230–31.

## THE CASE AT BAR

Whatever the situation among the various tribal factions, the signing of the April 2000 agreement with Park Place effectively terminated the Tribe's partnership with plaintiffs. They seek damages from Park Place for interfering with their relationship with the St. Regis Mohawks.

Plaintiffs claim that the reason their casino project was never approved is because they were "sabotaged by defendant's efforts to scuttle the ... casino project." *Catskill I*, 144 F.Supp.2d at 226. Defendant claims that the Tribe signed with Park Place because it offered the Tribe a better deal than Plaintiffs did at a time when there was no enforceable (i.e., fully approved) contract between plaintiffs and the Tribe. Defendant also alleges that no Park Place principals ever attempted to wrongfully sabotage Plaintiffs' partnership with the Tribe. Furthermore, Defendant claims that the relationship between the three Chiefs of the Tribe—Alma Ransom, Hilda Smoke and Paul Thompson—and Plaintiffs was so strained by April 2000 that the Tribe, through the Chiefs, would have signed a deal with Park Place in the absence of any of the alleged wrongful conduct by Park Place.

In *Catskill I*, this Court dismissed Plaintiffs' First Cause of Action (alleging tortious interference with contractual relations) and their Third and Fourth Causes of Action (claiming unfair competition and violation of the Donnelly Act). Plaintiffs' Second Cause of Action, for tortious interference with prospective business relations, survived the motion to dismiss. Upon Plaintiffs' timely motion for reconsideration, I reinstated so much of Plain-

tiffs' First Cause of Action as related to tortious interference with one of the four agreements pled in that claim—the so-called Land Purchase Agreement, or "LPA." (Catskill II)

Defendant now moves for reconsideration of *Catskill II*, and urges the Court to reinstate its original ruling, which dismissed the First Cause of Action in its entirety. Defendant argues that a recent decision by the Eighth Circuit Court of Appeals, *United States v. Casino Magic Corp.*, 293 F.3d 419 (8th Cir.2002), renders the holding in *Catskill II* questionable. Plaintiffs argue that Defendant's motion is untimely, and also that the Eighth Circuit's decision does not compel a reconsideration of *Catskill II*. Park Place also moves for summary judgment dismissing the First Cause of Action on the merits.

Defendant also moves for summary judgment on plaintiffs' Second Cause of Action. Park Place argues that the claim for tortious interference with contractual relations must be dismissed because (1) Plaintiffs can produce no admissible evidence of any wrongful conduct on the part of Park Place, (2) Plaintiffs cannot show that any statements or actions were the "but for" cause of the Tribe's decision to sign an agreement with Park Place, and (3) Plaintiffs' claims for lost profits are entirely speculative and cannot be proven as a matter of law. Plaintiffs oppose this motion.

### DISCUSSION

I. *The Holding in Catskill II Is Erroneous; Therefore Defendant is Entitled to Summary Judgment Dismissing the First Cause of Action*

A. *The Motion for Reconsideration*

On June 18, 2002, Park Place moved for reconsideration of this Court's decision of July 23, 2001, that held that the LPA, although collateral to the Amended and Restated Gaming Facility Management Agreement (hereinafter the "Management Agreement"), was not subject to review by the National Indian Gaming Commission (NIGC) pursuant to 25 U.S.C. § 2711(a)(3), because that section does not apply to agreements collateral to management contracts that relate solely to Class III gaming. *See Catskill Development, LLC v. Park Place Entertainment Corp.* ("*Catskill II*"), 154 F.Supp.2d 696, 702–03 (S.D.N.Y.2001). Because I had held that the LPA was not independently subject to review by either the NIGC or the Bureau of Indian Affairs (BIA), I held that the LPA was a valid and binding agreement, upon which Plaintiffs could base their claim of tortious interference with contract.

Park Place seeks reconsideration of *Catskill II* because, on its reading, *Casino Magic* holds that collateral agreements in Class III gaming are, in fact, subject to NIGC review, and also holds that such agreements, whether or not denominated "management agreements," are subject to agency review if they affect the management of the proposed casino. *Id.*

Plaintiffs claim that the motion for reconsideration is untimely. In the event that the court revisits the issue, plaintiffs claim that *Casino Magic* does not support reversal of this Court's earlier decision.

Plaintiffs are correct that Park Place's motion for reconsideration is untimely. However, Park Place is equally correct that a court has inherent power to correct an interlocutory ruling at any time prior to the entry of final judgment. Fed. R.Civ.P. 54(b); *Richman v. W.L. Gore & Assoc., Inc.*, 988 F.Supp. 753, 755 (S.D.N.Y.1997) (citing *Dictograph Products Co. v. Sonotone Corp.*, 230 F.2d 131, 134–35 (2d Cir.1956)); *Algie v. RCA Global Communications, Inc.*, 891 F.Supp. 875,

882 (S.D.N.Y.1994). In general, a court will reconsider a prior decision in the same case if there has been an intervening change in controlling law, there is new evidence, or a need is shown to correct a clear error or to prevent manifest injustice. *See United States v. Sanchez*, 35 F.3d 673, 677 (2d Cir.1994), *cert denied*, 514 U.S. 1038, 115 S.Ct. 1404, 131 L.Ed.2d 291 (1995); *Richman*, 988 F.Supp. at 755. The decision to grant or deny the motion for reconsideration is within the sound discretion of the district court, especially when there has been no appellate review of the prior decision. *Mina Investment Holdings, Ltd. v. Lefkowitz*, 184 F.R.D. 245, 250 (S.D.N.Y.1999).

I am at present considering a defense motion for summary judgment dismissing the First Cause of Action. The issue raised by Park Place is material to the decision on that motion. Thus, while the untimely motion for reconsideration can be denied on a technicality, the issue must be addressed before I can grant or deny summary judgment. In that context, I turn to them.

On the merits, Park Place is correct, though not for the reason it suggests.

### B. *The Holding in Catskill II*

To understand the reason why *Catskill II* must be vacated, one first needs to understand what it held.

In *Catskill I*, I held that the Management Agreement was void under 25 U.S.C. § 2711(b) which requires that any management contract have the approval of the Chairman of the National Indian Gaming Commission (NIGC) in order to be an enforceable contract. *Catskill I*, 144 F.Supp.2d at 232. I then held that the other agreements between plaintiffs and the Tribe—the LPA, the Shared Facilities Agreement and the Development and Construction Agreement (DCA)—were "collateral" to the Gaming Facility Management Agreement within the meaning of the Indian Gaming Regulatory Act (IGRA), 25 § 2711(a)(3). *Id.*, at 233. That section includes collateral agreements executed in conjunction with management contracts as part of the underlying management contract. This meant that the collateral agreements were also void because they lacked NIGC approval. *Catskill I*, 144 F.Supp.2d at 233. Alternatively, I held that all of the side agreements *except the LPA* were independently invalid because they had not been approved by the BIA pursuant to 25 U.S.C. § 81. *Id.*, at 234.[2] Because all of the contracts on which Plaintiffs based their tortious interference with contractual relations claim were void and unenforceable for one reason or another, I dismissed the First Cause of Action pursuant to Fed.R.Civ.P. 12(b)(6). *Id.* at 234–35.

**2.** At the time *Catskill I* was decided, I was unaware that the NIGC had already ruled that the Development and Construction Agreement (DCA) was part and parcel of the Management Agreement, and thus monies paid by the Tribe to plaintiffs under that agreement were subject to the statutory cap on management fees to non-Tribal entities. *See* Ex. E to Park Place's Motion for Reconsideration of This Court's Decision of July 23, 2001, Letter from the NIGC to the Tribal Chiefs, the Management Board of the St. Regis Mohawk Gaming Authority, Mohawk Management, LLC and Alpha Hospitality Corp., "Issues" attachment, dated April 19, 2000 (Limiting its review to the Management Contract and the Development and Construction Agreement, "[t]he NIGC has determined that the [Management] Contract and DCA [Development and Construction Agreement] together are management contracts and are subject to NIGC approval"). Thus, there was no need for me to spend time considering that question in *Catskill I*. Park Place does not appear to have been aware of this ruling at any time during the *Catskill I–Catskill II* debate. Plaintiffs, however, were fully aware of it. They have yet to explain why the court was not apprised of the agency's ruling.

**430**

Plaintiffs timely requested reconsideration, arguing that 25 U.S.C. § 2711(a)(3), by its literal terms, applies only to management contracts for Class II gaming.[3] Under the Management Agreement between Plaintiffs and the Tribe, the Tribe took full responsibility for Class II gaming. Plaintiffs argued that since the Management Agreement addressed only Class III gaming, the "collateral agreement" rule of Section 2711(a)(3) did not apply to the LPA, the Shared Facilities Agreement or the Development and Construction Agreement.[4]

In *Catskill II*, I held that agreements collateral to management contracts were not subject to the voiding provisions of IGRA where the management agreement related to a Class III gaming contract, rather than a Class II gaming contract. *Catskill II*, 154 F.Supp.2d at 703. In so doing, I adopted the literalist view of the statute championed by plaintiffs. Section 2711 of IGRA relates to management agreements. Subsection (a) of that statute is captioned "Class II gaming activity; information on operators." Paragraph (1) of Subsection (a) is explicitly limited to "a management contract for the operation and management of a class II gaming activity." Paragraph (3) of Subsection (a), the provision that integrates collateral agreements into management contracts, provides: "For the purposes of this chapter, *any reference to the management contract described in paragraph (1)* shall be considered to include all collateral agreements to such contract that relate to the gaming activity." (Emphasis added). Thus, Section 2711(a)(3) by its terms appears limited to contracts relating to Class II gaming activity.

Section 2710(d) of IGRA—which discusses the regulation of Class III Gaming—authorizes the NIGC to review management contracts for Class III Gaming operations. Section 2710(d)(9) incorporates a number of Section 2711's provisions—all of which relate specifically to Class II Gaming—into the review process for Class III management contracts. However, Section 2711(a)(3) is not one of the provisions incorporated by reference into Section 2710(d)(9). No other section of the IGRA contained any analogous provision applicable to Class III management contracts.

For this reason, I concluded that the term "management contract," as used in Section 2710(d)(9) (relating to Class III Gaming), did not include collateral agreements that relate to the gaming activity. I vacated that portion of my earlier decision that had voided the four collateral agreements in reliance on Section 2711(a)(3). Because I had concluded in *Catskill I* that three of the four collateral agreements were invalid on other grounds, I did not reverse the dismissal of claims relating to them. However, since there was no basis other than the "collateral agreement" theory of Section 2711(a)(3) for invalidating the LPA, I reinstated the First Cause of Action insofar as it related to the LPA.

---

**3.** There are three categories of gaming as defined by the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701–2721 (1988). Class I gaming, which includes social games and traditional forms of Indian gaming connected to tribal ceremonies, is under the exclusive jurisdiction of Native American tribes. 25 U.S.C. §§ 2703(6), 2719(a)(1). Class II gaming, as defined by IGRA, includes bingo and other games similar to bingo, and is regulated by the NIGC. All other gaming activity (including both electronic gaming devices and traditional casino games, such as card tables, craps, roulette and slot machines) is Class III gaming.

**4.** Given the NIGC ruling discussed in Footnote 2 above, this argument, at least insofar as it applied to the DCA, was nothing short of astonishing.

## C. *The Casino Magic Decision*

Recently, the Eighth Circuit handed down a case in which it concluded that two agreements—a consulting agreement and a construction and loan agreement—that were not themselves management agreements were, when taken together, a management agreement requiring NIGC approval. Park Place contends that this case—*United States v. Casino Magic Corp.*, 293 F.3d 419, 425 (8th Cir.2002)—compels reversal of the decision in *Catskill II*.

In *Casino Magic*, the United States and its relator brought a *qui tam* action under IGRA against a casino manager over a series of agreements between the Sisseton–Washington Sioux Tribe (hereinafter the "SWS Tribe") and the casino manager. In July 1994, the SWS Tribe entered into a management agreement with Casino Magic in order to build and operate a casino on Indian trust land in North Dakota. The agreement was created in accordance with IGRA and the SWS Tribe and Casino Magic submitted the agreement to the NIGC for approval. In September 1994, after finalizing the terms of the management agreement, the SWS Tribe and Casino Magic entered into a Secured Loan Agreement under which Casino Magic agreed to loan up to $5 million to the SWS Tribe so that it could begin building the casino.

For reasons not clarified in the opinion or the record, the Management Agreement that had been submitted to the NIGC was never approved. Therefore, in March 1996, the parties entered into a Consulting Agreement under which Casino Magic would be a consultant, and not a manager, in order to assist the SWS Tribe in developing and operating the Class III gaming. *United States v. Casino Magic Corp.*, Civ. 98–1033 (D.S.D. Apr. 23, 2001). Under the Consulting Agreement, Casino Magic would develop and identify market plans, provide an accounting system, security plans, job descriptions and develop a long-term master plan for the casino. The parties submitted the Consulting Agreement to the NIGC for approval and was informed by the NIGC that no approval was necessary because the agreement was not a management agreement.

In June 1996, the BNC National Bank of Bismark, North Dakota (BNC) entered into a Construction and Term Loan Agreement under which BNC would make advances to the SWS Tribe in the aggregate amount of $17.5 million, conditioned upon Casino Magic's commitment to contribute to the loan up to $5 million. Later that month, BNC and Casino Magic entered into a Participation Agreement to formalize Casino Magic's consent to contribute to the SWS Tribe's financing for the casino. The parties submitted the Construction and Term Loan Agreement to the BIA for § 81 approval, but did not submit the agreement to the NIGC.

On January 15, 1998, Casino Magic asked the Tribe for payment of its consulting fee. Instead, the Tribe terminated the Consulting Agreement. It then submitted the Consulting Agreement and the Construction and Term Loan Agreement to the NIGC for joint review. The NIGC found that "the Consulting Agreement and related documents, when considered as a whole, are management contracts," that required the approval of the Chairman of the NIGC. The SWS Tribe replaced Casino Magic with another consulting company.

Plaintiff brought a *qui tam* action claiming that prior payments to Casino Magic totaling almost $7 million violated 25 U.S.C. § 81, 18 U.S.C. § 438 and 25 U.S.C. § 2711, and seeking return of those funds. The district court disagreed, for four sepa-

rate reasons, none of which is pertinent here.

Plaintiff appealed to the Eighth Circuit, and the United States joined its relator on the appeal. On June 7 of this year, the Court of Appeals reversed and ruled that the two agreements, taken together, were indeed a management agreement, because the Construction and Term Loan limited the tribe's powers vis a vis its consultant, Casino Magic. In so holding, the court relied very heavily on the NIGC's opinion that the two documents, read together, created a management agreement requiring NIGC approval.

In the course of its ruling, the Eighth Circuit did indeed appear to apply Section 2711(a)(3) to Class III gaming agreements. It stated, "A management contract includes the principal contract and all collateral agreements to such contract that relate to the gaming activity." *Casino Magic*, 293 F.3d at 425 (*quoting* § 2711(a)(3)). However, the Court of Appeals did not parse the language of Section 2710 and 2711 and find the statutory gap that was analyzed in *Catksill II;* it simply assumed that the Section 2711 standard applied to Class III as well as Class II gaming.

More important, the Eighth Circuit's reference to Section 2711(a)(3) was wholly unnecessary, because neither that court nor the NIGC (on whose prior decision it relied) had before it any agreement that

was "collateral" to a "management contract." Indeed, in *Casino Management*, there was no management contract to which anything could be collateral.[5] Rather, the NIGC decided that the Consulting Agreement and the Construction and Loan Agreement constituted a management contract within the meaning of IGRA *when they were read together.* Neither of those agreements was itself a management contract—indeed, the NIGC had already ruled that the Consulting Agreement, read alone, was NOT a management contract—and neither of them was collateral to any third agreement that purported to be a management contract. Thus, in the most technical sense, Section 2711(a)(3) was irrelevant to the NIGC's original decision.[6]

So if *Casino Magic* neither explains nor fills in the statutory gap identified in *Catskill II,* how can I conclude that the LPA requires NIGC approval in order to be a valid and binding contract?

## D. *The Code of Federal Regulations*

The answer resides in a resource that all parties—myself included—have overlooked until now: the Code of Federal Regulations.

The NIGC has undoubted power to review Class III Gaming management contracts—Section 2710(d)(9) of IGRA says so. Moreover, in IGRA, Congress expressly ceded to the NIGC authority to make rules applicable to the review of all management contracts. 25 U.S.C.

---

**5.** To be more precise, the management agreement into which the parties originally entered had not received NIGC approval and was long since abandoned. It did not figure in either the NIGC's or the Eighth Circuit's decision.

**6.** Ultimately, the Eighth Circuit in *Casino Magic* did no more than defer to the NIGC's determination that it had plenary review power over these agreements and that the two agreements taken together created a manage-

ment agreement. Ordinarily this is an appropriate course of action, since the decisions of administrative agencies about matters within their peculiar expertise are entitled to great deference. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *London v. Polishook*, 189 F.3d 196, 199–200 (2d Cir.1999). It does not appear that anyone challenged the NIGC's review power in Casino Magic, as plaintiffs do here.

§ 2706(b)(10) ("The Commission ... shall promulgate regulations and guidelines as it deems appropriate to implement the provisions of this chapter."). The CFR contains the rules for review of all management contracts with recognized tribes, whether for Class I, II or II gaming.

In Section 2710(d)(9), Congress ordered the NIGC to include in its rules for reviewing Class III gaming management agreements certain statutory provisions applicable to Class II management agreements. Section 2711(a)(3), as noted in *Catskill II*, was not one of the provisions that Congress ordered the NIGC to apply to Class III gaming agreements. But Congress did not prohibit the NIGC from including the Section 2711(a)(3) standard in its regulations for Class III management contract review; it simply did not compel the agency to do so. The NIGC was perfectly free to conclude that the definition of Class II Gaming "management contracts" ought to apply to Class III Gaming contracts as well.

■ That is precisely what happened. The NIGC's rules, codified at Chapter 25, Title III of the Code of Federal Regulations, require agency review of management contracts for both Class II and Class III gaming. 25 C.F.R. § 533.1. According to these duly-promulgated regulations, a "management contract" is defined as "any contract, subcontract, *or collateral agreement* between an Indian tribe and a contractor or between a contractor and a subcontractor if such contract or agreement provides for the management of all or part of a gaming operation." 25 C.F.R. § 502.15 (emphasis added). A collateral agreement, as defined by the NIGC, is "any contract, whether or not in writing, that is related, either directly or indirectly, to a management contract, or to any

rights, duties or obligations created between a tribe (or any of its members, entities, or organizations) and a management contractor or subcontractor (or any person or entity related to a management contractor or subcontractor)." 25 C.F.R. § 502.5. The LPA fits squarely into the NIGC's definition of an agreement collateral to the management agreement. I so found in *Catskill I;* I did not reverse myself on that point in *Catskill II,* and I see no reason to do so today.

Thus, the NIGC has regulatory authority to review and approve the LPA as a collateral agreement, despite the omission of any reference to Class III management contracts in Section 2711(a)(3), or to Section 2711(a)(3) in Section 2710(d)(9). In the regulatory context, Plaintiffs appear to have conceded as much, since they submitted the LPA to the agency for review and engaged in a lively debate with the NIGC over whether the LPA was itself part and parcel of the Management Agreement—an issue that was never finally resolved at the agency level. See Ex. E to the Motion for Reconsideration. At no point in this correspondence did Catskill object to NIGC review of the LPA on the ground that the agency lacked statutory authority to review agreements collateral to Class III management contracts.

So I was right—albeit for the wrong reason—in *Catskill I,* and wrong in *Catskill II.* Because it had not yet received NIGC approval, the LPA, like the other three collateral agreements as well, was void and of no effect. Therefore, Park Place is entitled to summary judgment dismissing the First Cause of Action.[7]

Resolution of this issue allows me to proceed to the merits of Park Place's motion for summary judgment on the one

---

7. The other three collateral agreements are also void for lack of NICG approval, as I originally held in Catskill I. To the extent Catskill II holds otherwise, it is vacated.

remaining claim for relief—which must be granted

## II. Defendant's Motion for Summary Judgment Dismissing the Second Cause of Action

### A. Summary Judgment Standard

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e)." The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson, supra*, 477 U.S. at 248, 106 S.Ct. 2505.

### B. Tortious Interference with Prospective Business Relations

A defendant is liable for tortious interference with a plaintiff's prospective business relations when four conditions are met: (1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured. *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108 (2d Cir.1997). A valid contract is not necessary in order to state a claim for tortious interference with prospective business relations *See Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 205 (2d Cir.1998). "[A] plaintiff can recover if that plaintiff can prove that the Defendant tortiously interfered with 'a continuing business or other customary relationship not amounting to a formal contract.'" *Id.* (quoting Restatement (Second) of Torts § 766B (1979)).

In its previous decision, this Court found that Plaintiffs had a business relationship with the St. Regis Mohawks in their joint exploration of a major casino gambling opportunity. *Catskill I*, 144 F.Supp.2d at 235. Defendant's knowledge of that relationship is also indisputable. *Id.* The issues here are two: (1) whether plaintiffs have met the "sole purpose or malice" requirement, and (2) whether the relationship between the Tribe and Plaintiffs was in fact injured by Park Place's actions.

### 1. Plaintiffs Can Not Prove Wrongful Means

If the defendant's interference is intended, at least in part, to advance its own competing business interests (as is true of Park Place here), a claim for tor-

tious interference with prospective business relations (as opposed to tortious interference with an existing contract) fails unless Plaintiffs can show that Park Place acted with malice. Malice is established by showing that the defendant used wrongful means to advance its interests. Wrongful means include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure." *See NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.,* 87 N.Y.2d 614, 621, 664 N.E.2d 492, 496, 641 N.Y.S.2d 581, 585 (1996). Persuasion alone, although knowingly directed at interference with the relationship, is not sufficient. *Guard–Life Corp. v. S. Parker Hardware Manf. Corp.,* 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980); *Phlo Corp. v. Stevens,* 2001 WL 630491, at *7 (S.D.N.Y. June 7, 2001)

 a. *There Is No Evidence That Park Place Made Fraudulent or Otherwise Wrongful Comments about the Governor, Plaintiffs' Ability to Secure Financing, or about Plaintiffs' Principals*

In *Catskill I,* this Court found that the tortious interference with prospective business relations claim withstood Defendant's motion to dismiss because Plaintiffs had sufficiently alleged that "Park Place principals lied about Catskill and the status of the pending regulatory approval to induce the Mohawks to break their agreement with Catskill." *Catskill,* 144 F.Supp.2d at 236. Defendant now argues that there is no evidence in the record that Park Place ever made any of the alleged misrepresentations mentioned in the complaint, which are as follows:

 1. That the Governor of the State of New York would not approve Plaintiffs' project without Park Places's involvement. Complaint at ¶¶ 97, 101.

 2. That the Plaintiffs and their principals were "unsuitable." Complaint at ¶ 103.

 3. That, even if the casino project were approved, Plaintiffs could not arrange financing. Complaint at ¶ 104.

 4. That Park Place maligned the reputations and integrity of the principals and their ability to develop, finance and operate the casino project.

Defendants are correct. There is no admissible evidence in the record that Park Place ever made any statements to the Tribe about the Governor's failure to approve the project without Park Place's involvement, that Plaintiffs could not arrange financing even if the casino project were approved, or that Park Place otherwise maligned the reputations and integrity of Plaintiffs' principals. The Mohawk Chiefs, the purported recipients of these statements, all testified that Park Place made no derogatory statements about the Plaintiffs to them or in their presence. *See* Deposition Transcript of Chief Alma Ransom at 360 (hereinafter the "Ransom Dep."); Deposition Transcript of Chief Hilda Smoke at 219 (hereinafter the "Smoke Dep."); Deposition Transcript of Chief Paul Thompson at 184–85 (hereinafter the "Thompson Dep."). The Chiefs also testified that Park Place made no representations that the NIGC would find Plaintiffs unsuitable. Ransom Dep. at 86–88; Smoke Dep. at 219; Thompson Dep. at 234. In fact, the Chiefs testified that any adverse information they had procured relating to the Plaintiffs and their questionable history in the casino industry came from NIGC officials, *see* Ransom Dep. at 69–80, 169, 320–21; Smoke Dep. at 206–15; Thompson Dep. at 78, 80–85, the Oneida Indian Tribe, *see* Ransom Dep. at 318–19,

436

and from the Mohawks' own research, *see* Ransom Dep. at 320; Smoke Dep. at 214–19; Thompson Dep. at 235–36, 274, 303.

Clive Cummis is the former Executive Vice President of Park Place and Arthur Goldberg was the former CEO of Park Place. Mr. Goldberg died before he could be deposed. Cummis testified that he never made any statements about the necessity of Park Place's involvement in order to receive the Governor's approval, and that he never heard the late Mr. Goldberg make such statements. Deposition Transcript of Clive Cummis at 421–22, 504–05 (hereinafter the "Cummis Dep.").

■ Cummis also testified that Goldberg only advised the Chiefs of Park Place's experience, its financial wherewithal, its ability to finance any project that might be built and its history in the gaming business. Cummis Dep. at 518–19. Cummis does admit to making one statement to the Chiefs that could be construed as a derogatory comment: he told Tribal officials that, in his experience, if an application for a gaming license had not been approved after four years, it was likely not to win approval. Cummis Dep. at 468–69. This is not a malicious statement about Plaintiffs' abilities; as a matter of law, this must be characterized as a statement of opinion, not of material fact. The Tribe was capable of weighing the credibility of this statement for themselves. *See, e.g., Union Car Advertising Co. v. Collier,* 263 N.Y. 386, 399, 189 N.E. 463, 469 (1934); *Elghanian v. Harvey,* 249 A.D.2d 206, 206, 671 N.Y.S.2d 266, 266 (1st Dep't 1998).

Plaintiffs do not challenge Defendant's contention that the record does not support the allegations of Paragraph 103 of the Complaint. In fact, Plaintiffs have explicitly abandoned reliance on the so-called "suitability" representations mentioned in that paragraph of their pleading. In their July 10, 2002 Reply Memorandum

in Support of Motion in Limine Regarding Inadmissibility of Alleged Bad Acts or Bad Character (hereinafter the "In Limine Reply"), Plaintiffs, in opposing the admission of any evidence of their suitability for the casino project, state "that they would not rely on proof of any derogatory and/or fraudulent statements regarding suitability made by Park Place to establish the 'wrongfulness' element of their tortious interference claims." *Id.* at 2. Plaintiffs also do not directly challenge Park Place's argument that there is no evidence of the other alleged derogatory statements listed above.

Plaintiffs argue instead that Park Place made certain misstatements to the Tribe that do not directly relate to Plaintiffs, such as that the State of New York was going to shut down the Tribe's Akwesasne Casino for unpaid revenue-sharing fees, Complaint at ¶ 101, that the federal land-into-trust approval for the Monticello Casino was "portable," Complaint at ¶ 102, that a casino project at Park Place's site would be approved within four months rather than the usual three to four years, and that the Tribe's agreements with the Plaintiffs were not validly authorized or properly executed by the Tribe, Complaint at ¶ 104.

There is no evidence in the record that any representative of Park Place ever represented to the Tribe that the State of New York was about to shut down the Akwesasne Casino for any reason. In fact, the Chiefs testified that their own tribal gaming commission had warned them that the Akwesasne casino was in trouble. Ransom Dep. at 148; Smoke Dep. at 327–328. In addition, it is a fact that the Akwesasne casino owed approximately $3 million to the State of New York and the State made a demand for these monies on April 7, 2000. Carpinello Decl., Ex. 4. There is no question that the Chiefs were

fully aware of this debt and of the possible consequences of their failure to pay it.

■ Clive Cummis did advise the Chiefs that it was his belief that, because the Tribe had received initial approval from the Bureau of Indian Affairs ("BIA") for development of a casino on the Monticello Raceway site, federal approval for the proposed casino could come in four months. Cummis Dep. at 420–21. This was a statement of opinion about future action, however, which would not support a claim of fraud or misrepresentation under New York law. *See Union Car Advertising*, 263 N.Y. at 399, 189 N.E. 463; *Elghanian*, 249 A.D.2d at 206, 671 N.Y.S.2d 266. It thus does not qualify as "wrongful means." Furthermore, this statement does not derogate Plaintiffs; it is only puffery on the part of Park Place. Incidentally, it appears that the Chiefs, who had prior experience with the federal approval process, did not rely on Mr. Cummis' corporate braggadoccio. Ransom Dep. at 2451 Thompson Dep. at 128, 191, 230–31.

There is also no evidence in the record that Park Place advised the Tribe that the Tribe's agreements with Plaintiffs were not valid because they were not signed by the proper tribal authorities. Cummis Dep. at 361–62. Moreover, the validity of the various agreements—at least on that ground—was a matter of tribal law, as to which the Tribe would hardly rely on an outsider like Park Place.

Thus, there is absolutely no support in the record for Plaintiffs' claims that Park Place induced the Tribe to abandon their venture by making any misrepresentation about any subject.

As their fallback, Plaintiffs claim that the Defendant overlooked evidence of other wrongful conduct, namely:

1. That Park Place applied significant economic pressure on the Tribe to extract an agreement to develop a casino that included an exclusive right for Park Place to develop other casinos for the Tribe; and

2. That Park Place induced the Tribe to breach the LPA.

Obviously, the latter argument falls by the wayside now that I have concluded that the LPA was not a valid and binding contract. Park Place argues that there is no evidence to support Plaintiffs' contention that it exerted wrongful economic pressure over the Tribe. It further argues that any alleged "wrongful conduct" on its part worked Plaintiffs no harm. I agree on both points.

b. *There Is No Evidence That Park Place Exerted Economic Pressure over the Tribe to Induce Them to Sign an Exclusive Contract with Park Place*

■ Plaintiffs argue that Park Place applied economic pressure to the Tribe and to its Akwesasne casino business partners to induce the Tribe to repudiate its business relationship with Plaintiffs. There is no evidence from which a reasonable trier of fact could so conclude. Park Place most certainly offered the Tribe economic inducements that influenced the Tribe's decision to change business partners from Catskill to Park Place, but nothing Plaintiffs allege rises to the level of wrongful economic pressure.

The relevant facts are not in dispute. In the beginning of 2000, the Tribe was in substantial financial trouble because of the failing Akwesasne Casino. It owed $3 million to the State of New York. The State made an explicit demand for this money on April 7, 2000. The Chiefs testified that they desperately needed the money. The Chiefs themselves approached Park Place and asked for a loan in that amount as consideration for the right to develop casi-

nos elsewhere in the State. Ransom Dep. at 47–49, 61, 347–48; Thompson Dep. at 65–68. They never asked Plaintiffs for a $3 million loan because they didn't think that Plaintiffs would have that money. Smoke Dep. at 295. The Chiefs all agreed that saving the Akwesasne Casino and the 500 jobs the Casino provided was "the number one priority for the Chiefs in the Spring of 2000." Defendant's Memorandum, at 24 (citing Ransom Dep. at 47–49; Smoke Dep. at 104–05, 108–09, 116; Thompson Dep. at 46–47).

Plaintiffs argue that Park Place exerted wrongful economic pressure by playing on the Chiefs' desperation, promising them the $3 million loan, but only on the condition that Park Place become the exclusive developer of casinos for the Tribe in New York State. I assume for purposes of the motion that an exclusive development contract was the quid pro quo for the loan. The question is whether, as a matter of law, that constitutes wrongful economic pressure.

Plaintiffs cite *Italian and French Wine Co. of Buffalo, Inc. v. Negociants USA, Inc.*, 842 F.Supp. 693 (W.D.N.Y.1993), as support for its argument that Park Place exerted wrongful economic pressure by requiring an exclusive agreement, and thereby forcing the Tribe to terminate its business relationship with Plaintiffs. In *Italian and French Wine*, plaintiff was a wholesale distributor of wine and liquor in upstate New York who believed it had a binding contract—or at least the promise of a binding contract—with an American marketing representative of a particular Australian wine company. Defendant, a competitor of plaintiff's, was the marketing representative's largest distributor of the Australian wine in New York State. Plaintiff alleged that defendant interfered either with its existing contract with the wholesaler or with its prospective business relationship (depending on how the contractual validity issue was resolved) by threatening to terminate its own contract with the marketing representative unless the marketing representative refused to do business with plaintiff. *Id.* at 701–02. On defendant's motion to dismiss, the court found that plaintiff had stated a cause of action for tortious interference with prospective contractual relations because, if the facts as alleged in the complaint were true, defendant's conduct might be found to constitute wrongful "economic pressure." *Id.*, at 702.[8]

The present action is distinguishable from *Italian and French Wine* on multiple grounds. In *Italian and French Wine*, the defendant threatened to terminate a binding contractual obligation on its part in order to suppress competition. Here, by contrast, Park Place did not threaten to terminate any pre-existing binding obligation between itself and the St. Regis Mohawks in order to become part of the casino development project; Park Place had no such contract to use as leverage. More important, this case does not involve any anti-competitive conduct, since the Tribe plans to develop only one casino in the Catskills—the only question is who its non-Tribal partner should be. In the absence of any binding (which means governmentally-approved) agreement with plaintiffs, neither Catskill nor Park Place enjoyed a position superior to any other contender for that honor. Finally, in this case, the Tribe and Plaintiffs did not have any arguably enforceable contract with which Park Place could interefere (as plaintiff claimed it had in *Italian and French Wine*). *Cf. Perry v. International Transport Workers' Federation*, 750

---

**8.** The validity of the alleged contract could not be resolved on the motion to dismiss, so plaintiff's claim for tortious interference with contract was not dismissed, either.

F.Supp. 1189 (S.D.N.Y.1990) ("If the interferer acts with a business (competitive) motive as well as with a malicious one, the conduct may be actionable *when there is an existing contract* ").

The situation here is relatively simple. The Tribe needed money. Park Place had money. The Tribe asked Park Place for money. Park Place had no obligation to give the Tribe any money. So it bargained with the Tribe. Both parties came to the decision that an exclusive casino development contract was a fair trade for the immediate $3 million loan. That is not improper economic pressure. As a sister Court found earlier this year in a related case, *Scutti Enterprises v. Park Place Entertainment Corp.*, 6:01–CV–06533 (W.D.N.Y.2002), "The Mohawks simply choose [sic] an offer that paid them cash immediately, without the need for NIGC approval, over a deal that had been pending for approximately three years, but which could not be consummated because the NIGC refused to approve the project." *Id.*, at 14.

c. *The Fact That Park Place Allegedly Engaged in Acts of Fraud and Misrepresentations to Others Not Part of the Tribe Does Not Constitute "Wrongful" Conduct*

Finally, Plaintiffs allege that Goldberg and Cummis committed fraudulent acts and made misrepresentations to certain people—Peter Bronner, Gary Melius and Ivan Kaufman—in order to get an introduction to the Tribe. Plaintiffs claim that Park Place (through Goldberg) entered into an oral contract with Bronner, promising to pay him a commission in exchange for an introduction to the Tribe, and then disavowed its agreement once Park Place had its entree. Plaintiffs allege that Goldberg also entered into an agreement with Melius, promising to pay him $15

million for an introduction to the Tribe. Plaintiffs claim that Goldberg disavowed this agreement, too, after he and Cummis were introduced to the Tribe. Finally, Plaintiffs allege that Goldberg and Cummis promised Kaufman that Defendant would buy out his company's interest in the Akwesasne Casino, which was losing money and was at the risk of being closed, in exchange for an introduction to the Tribe. As was the case with Melius and Bronner, Plaintiffs allege that Defendant reneged on this agreement after Defendant was introduced to Tribal officials. It is not clear which, if any, of these men actually introduced Defendant to the Tribe.

Defendant argues that Plaintiffs have no standing to complain about the fact that Park Place refused to do a deal with these individuals because Plaintiffs suffered no damages from that refusal.

 There is no evidence that Bronner, Melius and Kaufman were members of the Tribe or exercised any control over the actions of the Tribe. Plaintiffs have no standing to complain about how Park Place treated these men; it is they, not Plaintiffs, who suffered any injury that flowed from this alleged misconduct. This court may not infer that Defendant and its principals made misrepresentations to the Tribe because they may have made misrepresentations to other individuals about matters that have nothing to do with Plaintiffs. *See Scutti Enterprises v. Park Place Entertainment Corp.*, 6:01–CV–06533 (W.D.N.Y.2002).

*Scutti* bears comment because it is so closely related to this case. The plaintiff in *Scutti* was a former business partner of Alpha Hospitality, Inc., an affiliate of Plaintiffs. Scutti, allegedly a proposed operator of the Mohawks' Bingo Palace at Akwesasne, sued Park Place for interference with prospective business relations after Park Place signed a $6 million loan

agreement with the Mohawks. Scutti alleged that Park Place compelled the Tribe to scuttle plans to expand the Bingo Palace at Akwesasne so as to ensure that the casino had sufficient cash flow to repay the Park Place loan. Scutti, like Plaintiffs here, asserted that Park Place's alleged mistreatment of Kaufman (as well as its alleged mistreatment of the Plaintiffs in this case), made Plaintiffs' conduct toward Scutti "wrongful."

In his March 11, 2002 decision, Judge Telesca rejected Scutti's argument that Park Place's alleged wrongdoing toward Kaufman and the Catskill plaintiffs could serve as a basis for plaintiff's claim of interference with his prospective business venture. *Scutti,* at 12, 16–17 ("... Park Place's alleged wrongdoing with respect to other entities not party to this lawsuit are irrelevant to the question of whether or not Park Place used wrongful means to interfere with the Scutti/Mohawk relationship"). *See also Excel Group, Inc. v. Permis Const. Corp.,* 254 A.D.2d 451, 452, 678 N.Y.S.2d 778, 779 (2d Dep't 1998) (defendant's improper use of another party's intellectual property does not make the defendant's interference with plaintiff's business relationship "wrongful"); *World Wide Communications, Inc. v. Rozar,* 1997 WL 795750, at *8 n. 23 (S.D.N.Y. Dec. 20, 1997) (counterclaim defendants' alleged threats to counterclaim plaintiff are not relevant to tortious interference claims since the threats were unrelated to any third-party contractual relations). The same reasoning bars Catskill's reliance on the wrongs allegedly done to third parties by Park Place.

2. *Plaintiffs Can Not Prove That Any Statements Made By Defendant or Any Actions Taken By Defendant Were The "But For" Cause of the Tribe's Decision*

Even if a trier of fact could find "wrongful conduct," the record contains no evidence that the alleged conduct was the "but for" cause of the Tribe's decision to sign an exclusive agreement with Park Place and to end its relationship with Plaintiffs.

To recover for tortious interference, Plaintiffs must show that their relationship with the Tribe was actually injured by Defendant's actions. In order to do this, Plaintiffs must show that they would have consummated their proposed business transaction with the Tribe and opened a casino at the Monticello Raceway but for Park Place's alleged wrongful conduct. Proving this "but for" causation requires more than a showing that it was "reasonably certain" or that Plaintiffs had a "reasonable expectation" that the casino deal would be consummated. *See Union Car,* 263 N.Y. at 401, 189 N.E. at 469; *Fine v. Dudley D. Doernberg & Co., Inc.,* 203 A.D.2d 419, 610 N.Y.S.2d 566 (2d Dep't 1994); *Williams & Co. v. Collins, Tuttle & Co.,* 6 A.D.2d 302, 306, 176 N.Y.S.2d 99, 103 (1st Dep't 1958).

Defendant claims that Plaintiffs can not establish "but for" causation for two reasons: (1) there is overwhelming evidence in the record that the Tribe would have signed an agreement with Park Place, even in the absence of the purported derogatory comments; and (2) even if the Tribe did not sign with Park Place, there were innumerable contingencies, all of which would have to be fulfilled, before Plaintiffs could have consummated their project with the Tribe.

In response, Plaintiffs ask the Court to apply a different standard in determining causation. They argue that they do not have to establish that they would have *ended up with a valid agreement* with Park Place but for Defendant's comments, but that they need only show that there

*would not have been a termination of the business relationship* with the Tribe but for Defendant's conduct. Based on that standard, Plaintiffs argue that there is sufficient evidence from which a jury could conclude that the Tribe would not have terminated its relationship with Plaintiffs but for the wrongful conduct of Park Place.

 I decline Plaintiffs' invitation to devise a new standard for recovery in a tortious interference with prospective business relations case. As I stated in *Catskill I,* the proper standard used to show the causation element of a tortious interference with prospective business relations is whether the Plaintiffs can prove that, but for the defendant's actions, plaintiffs would have consummated the prospective contractual relations with the Tribe. *See Catskill I,* 144 F.Supp.2d at 232; *Union Car Advertising Co. v. Collier,* 263 N.Y. 386, 401, 189 N.E. 463, 469–70 (1934); *American Preferred Prescription, Inc. v. Health Mgmt., Inc.,* 252 A.D.2d 414, 418, 678 N.Y.S.2d 1, 4 (1st Dep't 1998); *Riddell Sports, Inc. v. Brooks,* 872 F.Supp. 73, 78 (S.D.N.Y.1995) ("[A] plaintiff must allege that, but for defendant's conduct, his prospective business relations would have coalesced into an actual contract."); *Warner Bros. Pictures, Inc. v. Simon,* 21 A.D.2d 863, 863–64, 251 N.Y.S.2d 70, 71 (1st Dep't 1964). "Tortious interference with business relations 'applies to those situations where the third party would have entered into or extended a contractual relationship with plaintiff but for the intentional and wrongful acts of defendant.'" *M.J. & K. Co. v. Matthew Bender & Co.,* 220 A.D.2d 488, 631 N.Y.S.2d 938, 940 (2d Dep't 1995) (*quoting WFB Telecommunications v. NYNEX Corp.,* 188 A.D.2d 257, 590 N.Y.S.2d 460, 461 (1st Dep't 1992)).

The cases that Plaintiffs cite do not support a lower standard than the one announced in *Catskill I. See Merrill Lynch Futures, Inc. v. Miller,* 686 F.Supp. 1033, 1040 (S.D.N.Y.1988) ("A plaintiff must plead and prove that 'but for the unlawful actions of defendant, the contract would have been performed.'") (quoting *Demalco Ltd. v. Feltner,* 588 F.Supp. 1277, 1280 (S.D.N.Y.1984)); *Special Event Entertainment v. Rockefeller Center, Inc.,* 458 F.Supp. 72, 78 (S.D.N.Y.1978) (same).

One case cited by Plaintiffs, *Sharma v. Skaarup Ship Management Corp.,* 916 F.2d 820, 828 (2d Cir.1990) does state that in order to maintain a tortious interference with *contractual relations* claim, plaintiffs must establish that there would not have been a breach of a contract but for the activities of Defendant. But this case is distinguishable on many levels. First, it was a decision on a motion to dismiss, and the Court was addressing the minimal allegations necessary to preserve the tortious interference claim. Second, the claim was one for tortious interference with contractual relations, not prospective business relations. "The tort of interfering with prospective contractual relations has more demanding requirements for establishing liability than those required for existing contractual relationships." *Italian & French Wine,* 842 F.Supp. at 701 (citing *Perry,* 750 F.Supp. at 1207). Third, the cases cited by the *Sharma* court—*Special Event Entertainment* and *Merrill Lynch Futures*—simply don't support the proposition that all plaintiffs must show is that there would not have been a breach of contract but for defendant's wrongful conduct; both of these cases, as cited above, state that "plaintiff must plead and prove that 'but for the unlawful actions of defendant, *the contract would have been performed.'*" *Merrill Lynch Futures,* 686 F.Supp. at 1040.

Therefore, in order for Plaintiffs to prove that damages resulted from Park

Place's alleged wrongful conduct, they would have to establish that, but for this alleged conduct, Plaintiffs and the Tribe would have continued their business relationship and received the approvals necessary to build and open the casino. This they cannot do.

Defendant claims that the Tribe would have signed with Park Place regardless of any alleged wrongful conduct on its part, because (1) Plaintiffs' relationship with the Chiefs was strained to the breaking point and the Chiefs were frustrated with the long delay in the approval process, and (2) objectively, Park Place's proposal was significantly more favorable to the Tribe than Plaintiffs' proposal. There is ample evidence, in the form of deposition testimony and various communications and documents, that the Chiefs did not enjoy a good business relationship with Plaintiffs and were eager to discuss any alternative casino development offers. Evidence shows that the proposed casino deal between Park Place and the Tribe provides much more monetary and management benefits to the Tribe than in Plaintiffs' proposed casino deal.

However, there is no need to explore this ground, because there is a more fundamental flaw in Plaintiffs' position: no reasonable trier of fact could conclude that Plaintiffs would have "consummated" their deal with the Tribe. The very legality of Plaintiffs' project has yet to be determined by New York courts. The Governor had not approved the project. The BIA has not approved final transfer pursuant to 25 C.F.R. Part 151. No compact allowing the Mohawks to undertake casino gambling in the Catskills has been signed or approved by the federal government. After four years, Plaintiffs' contracts with the Tribe had not been approved by the NIGC. Plaintiffs never received approval from the New York State Racing & Wagering Board. And Plaintiffs never received financing for their project. Plaintiff cannot demonstrate that any of these necessary predicates to its project would inevitably have come to fruition, let alone that all of them would have.

a. *The Legality of Any Indian Gaming Project Has Yet to be Determined in New York*

The prospect of any casino's opening in the Catskills is unclear at best. I directed the parties to address the significance of pending litigation challenging the legality of gaming compacts with Indian tribes in the State of New York and, in particular, the Third Departments's recent decision in *Saratoga County Chamber of Commerce, Inc. v. Pataki*, 740 N.Y.S.2d 733, 293 A.D.2d 20 (3d Dep't 2002).

In *Saratoga*, the question on appeal was whether, "as the result of the interaction of gaming policies established by the State's Constitution and statutes and Federal law, defendant Governor had the authority to execute a Tribal–State compact and amendment with the St. Regis Mohawk Tribe, allowing certain class III gaming activities on the Tribe's reservation." *Saratoga County*, 740 N.Y.S.2d at 734. The Third Department affirmed the lower court's ruling which held that Governor Pataki had violated the separation of powers doctrine when he entered into a compact with an Indian tribe allowing gambling on tribal lands under less onerous circumstances than those imposed on same gambling activities elsewhere in the state. *Id.* 735.

Although legislative approval for signing Indian gaming compacts was expressly given to the governor by the legislature in October 2001, Ex. 23 to Carpinello Decl., that legislation, in turn, has come under challenge in *Karr v. Pataki*, Index No. 718–02 (Sup.Ct. Albany Cty.) and *Dalton*

*v. Pataki*, Index No. 719–02 (Sup.Ct. Albany Cty.). No decision has been made in either of those cases challenging the constitutionality of the October 2001 bill. Until those litigations are resolved by the New York Court of Appeals, it is impossible to say with certainty that any Indian gaming facility intended to be built in the State of New York will pass legal muster.

### b. *The Governor Has Not Approved the Project*

In 1996, Catskill and the Tribe sought BIA approval of the application to place the Monticello Raceway property into trust for the benefit of the Tribe (the "land-into-trust" transfer). On April 6, 2000, the Assistant Secretary for Indian Affairs wrote to Governor Pataki, explaining that, after review of the application, he had "determined that a gaming establishment on the 29.31 acre-parcel of land located in Monticello, New York, would be in the best interest of the Tribe and its members, and would not be detrimental to the surrounding community.... Pursuant to Section 20 of IGRA, I seek your concurrence in this determination." *Catskill I*, 144 F.Supp.2d at 226. Governor Pataki never responded to the BIA's recommendation that the land-into-trust application be approved.

Defendant argues that Plaintiffs can not establish that the Governor ever would have concurred with the BIA's recommendation. I agree. The evidence strongly indicates that no such concurrence would have been forthcoming absent (1) agreement on a new gaming compact and (2) settlement of all land claims with the State of New York. *Id.* Indeed, the Chiefs testified that they were told that the Governor would withhold his consent until the land claims were settled. Smoke Dep. at 319–20; Ransom Dep. at 63–67; Thompson

Dep. at 192–93, 195, 288–89. *See generally* Exs. 4 & 10 to Carpinello Decl.

Needless to say, those claims have not been settled. The Mohawk land claims litigation has been pending for over twenty years. While the record (and press reports) suggest that the long-running lawsuit between the State and the Tribe is "virtually settled," R. Berman Dep. at 119–20, 489–91, 550, there is many a slip between the cup and the lip. Of particular note, any settlement needs to be ratified by the Mohawk Nation, Ransom Dep. at 67–68, 332–333, and there is absolutely no guarantee that it will be approved. Thompson Dep. at 194–95.

Mounting local opposition to Plaintiffs' proposed casino made the Governor's concurrence even more questionable. Plaintiffs had originally received substantial support from Sullivan County, the Town of Thompson and the Village of Monticello, because the Tribe had entered into a Memorandum of Understanding in 1996 that expressly promised direct payments to each of the municipalities to mitigate any harmful effects of the operation of the casino. *See* Ex. 30 to Carpinello Decl. Subsequent to that Memorandum of Understanding, Plaintiffs entered into an agreement with the Village of Monticello that met with the disapproval of the Supervisor of the Town of Thompson and the Sullivan County Legislature. Ex. 31 to Carpinello Decl. As of a result of the Monticello agreement, the Chairman of the Sullivan County Legislature testified that, unless the Plaintiffs were to encourage the Tribe to negotiate new agreements providing for similar benefits to the Town and the County, the County would unequivocally oppose a transfer of land-into-trust and would urge the Governor not to concur in any such land transfer. Pomeroy Dep. at 107–18; Ex. 32 to Carpinello Decl. The Town of Thompson Supervisor expressed

the same view. Cellini Dep. at 117–45. This local opposition to the Governor's concurrence further weakens the already weak probability that the Governor would have ever concurred and allowed the land-into-trust transfer necessary to operate the casino.

c. *The BIA Has Not Approved Final Transfer Pursuant to 25 C.F.R. Part 151*

As of April 14, 2000, the BIA had given approval to the Tribe's land-into-trust application pursuant to § 20, 25 U.S.C. § 2719. *Catskill I*, 144 F.Supp.2d at 226. However, certain procedures and contingencies had to be fulfilled before this approval could become final.

25 C.F.R. § 151.12 requires the publication of notice of the final decision of the BIA, and title cannot be taken sooner than 30 days after such notice is published. Such notice was never published for the Monticello site. If notice were published, interested parties—such as the Town of Thompson, the County of Sullivan, other project opponents, or others including those who brought the *Saratoga County* action—could challenge the BIA's determination.

Second, in its Findings of Fact, the BIA made it clear that transfer of title depended upon the BIA's certifying the accuracy of Plaintiffs' appraisal of the value of the land. Ex. 25 to Carpinello Decl. at CD56216. The BIA stated:

> The Land Purchase Agreement established a purchase price of $10,000,000. The Monticello Property was appraised at $95,760,000 as of July 1, 1999, by Appraisal Group International (*Binder III, Tab K*). The Bureau of Indian

Affairs will certify the accuracy of this appraisal before the land can be taken into trust pursuant to 25 CFR Part 151.

*Id.* At the same time that the BIA was reviewing the land into trust application, the NIGC was reviewing the management contract applications. In its never completed review of the LPA, the NIGC on several occasions indicated that the $10,000,000 purchase price appeared inflated, included some hidden management "compensation," and was simply not the "value" of the land. Ex E to Park Place's Motion for Reconsideration, CD32296, CD55627.063. Indeed, in one letter to the NIGC, Mohawk Management admitted that the $10,000,000 purchase price of the land was part of the Tribe's "pre-development costs" owed to Plaintiffs. *Id.* at CD 75198. If (and when) the BIA became aware of the fact that the 30 acres of land, without improvements, was not worth $95,760,000—and, indeed, was not even worth $10,000,000—it is doubtful that it would have certified the appraisal.[9]

Thus, while the BIA had given the transfer initial approval, lack of gubernatorial concurrence was far from the only obstacle to finalization.

d. *No Tribal/State Compact Had Been Signed or Approved by the Federal Government*

The Mohawks have no right to undertake casino gambling in the Catskills without New York State's approval in the form of a tribal/state compact. The 1993 compact with the Mohawks allows only for the playing of table games and only at Akwesasne. Ex. 33 to Carpinello Decl. It has no provision for electronic games anywhere or

9. An appraisal procured by plaintiffs places the value of the undeveloped land at $150,000 (Plaintiffs' Mem, at 50; Tahbaz Dep. at 713–715, 727–31; Vardi Dep. at 16–17; Vardi Appraisal, Ex. 21 to Carpinello Reply Decl.)—well below any level that might have been acceptable to the BIA.

for any form of gaming outside the reservation. A one-year compact allowing for the operation of electronic games at Akwesasne expired in May 2000. Ex. 34 to Carpinello Decl. Moreover, two subsequent amendments that would have allowed electronic games only at the Akwesasne Casino were rejected by the Department of the Interior. Exs. 35 and 36 to Carpinello Decl. Thus, even assuming that the Governor has the legal authority to enter into such a compact, the signing of such a compact and its approval by the federal government were not assured.

### e. *Plaintiffs' Contracts Had Not Been Approved by the NIGC*

No casino could be built without approval by the NIGC of Plaintiffs' management contract (which we now know includes *all* collateral agreements). Those contracts had been under review for four years, and from the NIGC correspondence, the NIGC was not close to approval in April 2000, when the process ground to a halt. The NIGC spent over two years investigating the backgrounds of Plaintiffs, and when Plaintiffs were unwilling to fund further background investigations, they asked the NIGC to convert their application from approval for a Class II and Class III casino to Class III alone. R. Berman Dep. at 438; Exs. 40 and 41 to Carpinello Decl.

Notwithstanding this change, the NIGC reserves the right to reject any management agreement based upon the suitability of the proposed manager *See* 58 F.R. 5818, 5819, *quoting* 25 U.S.C. § 2711(e)(1)(D); 25 C.F.R. § 533.6(c).

In January 2000, the NIGC raised serious concerns relating to Plaintiffs' Mississippi casino experience. Ex. 22 to Carpinello Decl. Plaintiffs responded to these issues, Ex. 67 to Carpinello Decl., but the NIGC was not satisfied with Plaintiffs' response. Thompson Dep. at 269–70; Ex. 8 to Carpinello Decl. at 10.

Any prediction as to whether the NIGC would have ever found Plaintiffs to be suitable for management of an Indian casino is, in the words of NIGC counsel, "raw speculation." Ex. 68 to Carpinello Decl. No jury could ever find that Plaintiffs would have received all of the requisite governmental approvals necessary in order to consummate their project if the Tribe had not signed an exclusive agreement with Park Place. Plaintiffs themselves admit that this is an impossible burden for anyone to carry. Memorandum in Opposition, at 32. Unfortunately for plaintiffs, the impossible burden lies squarely on their shoulders.

### f. *Plaintiffs Never Received Approval From the New York State Racing & Wagering Board*

Even if the Governor concurred in the BIA land-into-trust determination, the BIA gave final approval, the Mohawk land claims were resolved, a tribal/state compact was entered into and the NIGC gave approval to Plaintiffs' management agreements, Plaintiffs would still have had to receive a finding of suitability by the New York State Racing & Wagering Board. The NIGC told the Chiefs that such approval would take a year. Thompson Dep. at 275–76. Ex. 8 to Carpinello Decl. at 12. Plaintiffs had not even applied for this approval as of April 14, 2000, when the Tribe signed on with Park Place. However, the Board already had some problems with Plaintiffs.

When approving Catskill Development's operation of the Monticello harness track, the Racing & Wagering Board insisted that Robert Berman step aside as President of Catskill Development because of his involvement in a questionable bankruptcy action and the numerous judgments

entered against him in that action. Ex. 71 to Carpinello Decl. at 14. Additionally, the Board's investigation of Alpha noted Alpha's checkered history in the casino business. Ex. 71 to Carpinello Decl. at 17. In approving the operation of the harness track, the Board noted that its decision was made in part because Alpha would have no role in the operation of the raceway itself. *Id.* The casino, however, was going to be run by Plaintiff Mohawk Management LLC, half of which is owned by Alpha through a wholly-owned subsidiary. Ex. 74 to Carpinello Decl. The Board's previously-expressed concerns make the Board's approval of Plaintiffs' operation of a Class III gaming casino at the Monticello Raceway highly questionable.

### g. *Financing Was Never Secured for the Casino Project*

Plaintiffs and the Tribe could not build their proposed casino without capital to construct the casino project. Securing this financing was far from certain.

Wendell Brooks of Salomon Smith Barney, Plaintiffs' financial advisor, voiced many serious concerns over Plaintiffs' ability to obtain financing for the project. Brooks testified that one of the keys to a successful operation of a Native American casino was the formation of a "first-class casino operating team." Brooks felt that Plaintiffs never put such a team in place. Brooks Dep. at 82–83. He recommended to Plaintiffs that they hire an "established operator" or a "reputable management company" in order to provide "credibility to the financial markets." Brooks Dep. at 41–43, 75–80. · Further, he advised them that the financial viability of the project would be enhanced if a substantial equity investment was obtained, and if they secured a "back end completion guarantee" to assure the financing community that the project would be built. Brooks Dep. at

51–53, 68–70, 75, 85, 91–92, 121–22. As of April 14, 2000, Plaintiffs had none of these things. At no time did Salomon Smith Barney or anyone else to raise the funds necessary to build the proposed casino. Brooks Dep. at 54, 77–78, 119, 123; Thompson Dep. at 38.

\* \* \* \* \* \*

It is difficult to succeed on a tortious interference action relating to a new business. Proving "but for" causation is always difficult. Plaintiffs have failed to raise a genuine issue of fact as to whether "but for" causation exists. The obstacles standing in the way of Plaintiffs' consummating a deal with the Tribe were numerous and overwhelming, and plaintiffs have submitted no evidence from which a trier of fact could reasonably conclude that Catskill's casino would ultimately have been approved and built. Thus, Plaintiffs' claim for tortious interference with prospective business relations is dismissed. There is no need to address the issue of damages.

## CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment is granted and both of Plaintiffs' remaining claims are dismissed. Defendant's motion for reconsideration is denied as moot.

This is the decision and order of the Court.

The Clerk of the Court is ordered to close this file.